ALBANY,
Jan. 1812.

BRADHURST
v.
COL. INS. CO.

———⊕———

BRADHURST AND FIELD *against* THE COLUMBIAN INSURANCE COMPANY.

THIS was an action on a policy of insurance on the ship *Dean*, dated the 22d *July*, 1809, from *New-York* to *Bremen*, with liberty to touch at *Amsterdam*, or *Rotterdam*, or *Tonningen*, for a market; if turned away, to have liberty to go to a near open port, where she may be admitted; valued at three thousand dollars, the sum insured, being one half the ship; " warranted *American* property ; if captured or detained, the insured not to abandon, if the property is released in six months after advice is received here and notice thereof ; *free from seizure in port.*" The plaintiffs averred a loss by the perils of the sea.

The cause was tried at the *New-York* sittings, in *June*, 1811, before Mr. Justice *Thompson*. The interest of the plaintiffs, and the abandonment, were admitted. The property was *American*.

By the deposition of the master, which was read in evidence, it was proved, that the *Dean* was seaworthy when she sailed from *New-York*, on the 29th *June*, 1809. The cargo consisted of sugar, coffee, cotton, drugs and medicines, and various other articles shipped by the plaintiffs and others. During her voyage, on the 16th and 17th of *July*, the ship met with violent gales of wind and heavy seas, which caused her to spring a leak. The weather continued tempestuous until the 26th, and the leak continued to increase, so as to require all hands constantly at the pumps. Finding it impossible to keep the ship free, the captain, with the advice of the crew, determined, on the 1st of *August*, to put into the nearest port, for the preservation of the ship and cargo, as well as the lives of the crew; and being off the coast of *Holland*, he put into the *Texel*. On his arrival there, he found an embargo had been laid by the government. The ship went into the harbour of *New Diep*, where she was immediately repaired

*Marginal note:* If a ship, in a case of extremity, be voluntarily run ashore, and is afterwards recovered and performs her voyage, the damages resulting from the stranding are to be borne as general average. But if, by the act of running her ashore, the ship is destroyed and totally lost, but the cargo saved, this is not a case of general average, and the cargo is not bound to contribute.

and her leaks stopped, so that she was ready for sea, and would have proceeded on her voyage, had she not been detained by the embargo. On the 23d *August*, the ship, with near 20 others, lying in the *Texel* and *New Diep*, was ordered, by the government, to *Amsterdam*, and proceeded towards that place. She arrived at *Durgendam* the 30th *August*, and was detained there by an armed ship, until the 8th *September*, when the embargo was raised, and the ship, with her cargo, was permitted to proceed to sea. While the ship lay at *Durgendam*, the master received a written order from the government, dated the 4th *September*, requiring him to deliver out of the ship, to the bearer of the order, 25 boxes of *Peruvian* bark, and under that order, the master, against his will, delivered the bark. On the 9th *September* the ship proceeded back, and reached the *Texel* on the 14th, when she was brought to by an armed ship, and obliged to continue at anchor under her guns, without having any communication with any other vessel, or the shore, during four days, which detention was by an order or regulation of the government. On the 19th *September*, while the ship was so detained, a violent storm arose; the ship drifted from her anchors, and being in danger of running foul of several other vessels which were adrift, the master, after consulting the pilot and the officers and crew, and with their advice, and as the only means of extricating themselves from their dangerous situation, and of preserving their lives and the ship and cargo, determined to cut the cables and run the ship on shore. Having cut the cables, the ship was steered for the *Zuydwall*, on approaching which she struck and beat with great violence, and having no anchors or cables, she was driven, by the violence of the wind, high on the shore. The ship was greatly injured by the stranding; and, in the opinion of the master, it was impossible to get her off. On the 26th *September*, there was a government survey of the ship, and the surveyors were of opinion that there was hardly any probability that the ship could be got off; and if, by any extraordinary storm, which might occasion a rise of water, she could be got off, she was so much damaged, that the cost of repairs would far exceed her value when repaired. Leave was obtained from the government to sell the ship; but it did not appear how she was disposed of afterwards.

From the time of the stranding to the 25th *September*, the crew were engaged in discharging the cargo on board of lighters, employed by the master. About 50 hogsheads of the sugar were damaged, and partly dissolved by sea-water, in consequence of the

leaks. Some of the drugs were also damaged. The lighters with the goods proceeded to the *Texel* harbour, where they were detained by the embargo, and on the arrival of the cargo at *Amsterdam* in the lighters, it was seized and taken possession of by the officers of the government, and put into the government stores, where it was detained, by the government, when the master left *Holland* for the *United States*, on the 13th *October*.

ALBANY,
Jan. 1812.

BRADHURST
v.
COL. INS. CO.

When the ship first arrived in the *Texel*, *Field*, the supercargo, went up to *Amsterdam*, to obtain permission for the ship to go into the *New Diep*, in order to be repaired, as the *American* vice-consul, at the *Texel*, informed the master that such permission could not be obtained elsewhere. On the 13th *August*, permission was given to the master, by an officer of a ship of war, for the *Dean* to go into *New Diep*, and the ship was repaired the day after. The master also deposed, that it was his intention to have proceeded directly to *Bremen*, and not to touch or land any part of the cargo in *Holland*. That the *Dean* was not consigned to any particular place or person, but the cargo was under the management of *Field*, the supercargo, who also had the direction of the ship, so far as respected her place of destination; that the cargo was seized, after it had been put on board of lighters, on its arrival in the *Texel*, under the *Dutch* decree of the 31st *July*, 1809.

One of the bills of lading was for 25 chests of *Peruvian* bark, and a hogshead and tierce of merchandise, to be delivered at *Bremen*, dangers of the sea only excepted, to Messrs. *W. & S. Willinck*, of *Amsterdam*; and it appeared that on the petition of Messrs. *W. & S. Willinck*, an order was obtained from the commissary general and director of the marine, to land the bark; which was accordingly done; and Messrs. *Willinck* certified, on the back of the bill of lading, that the 25 chests of bark had been delivered to them, by order of the government, for which they paid the freight; but the hogshead and tierce of merchandise was to be delivered at *Tonningen*, &c.

By the bills of lading of the rest of the cargo, it was to be delivered at the port of *Bremen*, to the order of the shippers.

By the instructions of the plaintiffs to the master, he was directed to proceed to *Bremen*, or to such port or ports as Mr. *H. W. Field*, the supercargo, might advise or direct, they giving to him all their authority to act for the best in his power, for the sale of their property consigned to him.

In the protest of the master, made at *Amsterdam*, he stated that

after the ship was on shore, the cargo was unloaded, with a view to be sent to his correspondents at *Amsterdam,* but the whole cargo, (except 25 boxes of *quinquina,* which, by a special order of the government, he had been obliged to deliver,) he had been, against his will and expectation, obliged to deliver into the king's stores at *Amsterdam.*

It appeared that the defendants were also insurers of goods of the plaintiffs, on board of the same vessel, for about 5,000 dollars; and goods for other shippers were insured to the amount of about 26,000 dollars. The master knew of no insurance, until after the loss.

The jury found a verdict for the plaintiffs, subject to the opinion of the court on a case containing the above facts.

The whole of the above facts are not stated as relative merely to the action on the policy on the *ship,* but with a view to the two succeeding cases on the *freight* and *cargo,* for the same voyage.

*Colden,* for the plaintiffs. The plaintiffs claim a total loss by the perils of the sea; and it is not easy to imagine what ground of defence can be maintained by the defendants. It is understood, however, that it will be contended, that this was a case of general average to which the goods saved ought to contribute. But here was no voluntary and deliberate sacrifice of a part for the safety of the whole. It was a voluntary stranding, followed by a shipwreck or total loss, which is never a case of general average.* If the ship had been got off, the expenses of getting her off might have been general average. But supposing it was a case for a general average, yet, according to the decision of this court in *Maggrath & Higgins* v. *Church,*† the plaintiffs are entitled to recover the whole amount of the loss of the defendants, in the first instance, and they must look to the goods for the contribution.

*C. I. Bogert* and *S. Jones,* jun. contra. The vessel was not driven on shore by the storm, but the captain, on consultation with the crew, cut her cables, and run her on shore, for the general preservation of the ship and cargo, and the lives of the men. It was a voluntary stranding, for the sake of greater safety. The vessel was not totally lost. She remained high and dry on the shore; and it was a question whether she could not have been repaired.

Suppose the whole cargo had been thrown overboard, to save the vessel and the lives of the crew, would it not be a case of general average, as much as if there had been a *jettison* of part of

* 1 *Emerigon,* 164. 668. 670.

† 1 *Caines' Rep.* 196.

the cargo only ? To constitute a case of general average, it is sufficient that the subject has been voluntarily sacrificed for the general safety.

The case of *Maggrath & Higgins* v. *Church* does not apply; for here the plaintiffs are owners of the vessel, freight, and goods.* The defendants, therefore, are entitled to have the general average stated, and the amount which the cargo is to contribute deducted.

ALBANY,
Jan. 1812.

BRADHURST
v.
COL. INS. Co.

* *Jumel &
Desobry* v.
*Marine Ins.
Co. 7 Johns.
Rep.* 412.

*D. B. Ogden*, in reply, observed, that where a ship is totally lost by one and the same peril, in whatever manner it may happen, it cannot be a general average. No such case can be found in the books. All the writers speak of a *damage* or partial injury. A loss which does not conduce to the preservation of both ship and cargo, is not an average loss. It must appear that the ship and the rest of the cargo were, in fact, saved.†

In the case of *Jumel & Desobry* v. *Marine Insurance Company*, the court proceeded on the ground of the insured being the owner of the *whole cargo*, as well as of the vessel and freight. Here the plaintiffs owned only about *one sixth* of the whole. This case, therefore, comes within the principle of *Maggrath & Higgins* v. *Church*.

† *Marshall*,
537, 542.

KENT, Ch. J. delivered the opinion of the court. The loss of the ship is to be attributed to the perils of the sea. She was forced into the *Texel*, by distress and danger, arising from tempestuous weather; and when she was ready to depart, she was stranded and lost in consequence of a storm. The only real question in the case is, whether the loss of the ship is to be borne as a general average, to which the plaintiffs, as owners of a portion of the cargo, as well as of ship and freight, are to contribute. But the better opinion is, that this is not a case for contribution, and that there is to be no deduction from the verdict. The cable of the ship was cut, after consultation, as necessary to extricate her from a perilous situation, and as best to be done for the preservation of the vessel, cargo and crew. Had the vessel been saved by this means, the loss of the cable would have formed an *item* for a general average. But it appears that after the cable was cut, they steered for the *Zuydwall*, and that on approaching it, the ship struck and beat with great violence on the ground, and was driven high on shore by the storm. Upon a subsequent survey of the ship, the surveyors were of opinion, and in which the captain con-

curred, that there was " hardly any probability" that the ship could be got off, and that if she could, she was so much damaged, that the costs of repairing her would " far exceed" what would be her value after she should be repaired. What became of the ship afterwards does not appear. Here was not only a loss of the voyage; but there is every reason to conclude that there was a total physical loss of the ship, by means of shipwreck. The cargo was principally saved uninjured. It was further stated in proof, that when the ship's cable was cut, it was with the intention, and for the purpose, of running her on the *Zuydwall*, which was accordingly done.

If a ship, in a case of extremity, and to avoid impending danger, be voluntarily run ashore, and she is afterwards recovered and performs the voyage, the damages resulting from this sacrifice are to be borne as general average. There cannot be a doubt as to the existence of this rule; for it is to be met with in all the books that treat of contribution. But another and more difficult question is, whether there is to be a contribution from the surviving cargo, if the ship should happen (as in this case) to be destroyed and lost by the act of running her ashore. The question does not appear ever to have arisen in the *English* courts, and we must have recourse to those foreign works which, in the absence of *English* decisions, are the best and most authentic evidence of the maritime law. The books, in general, have not treated this point with sufficient perspicuity and precision; but from a view and comparison of them, it is pretty evident that the weight of authority, no less than the reason of the rule, is against the contribution. The marine ordinances and writers on maritime law mention general average as being confined to the damage which the vessel so run ashore may have sustained, and the expenses of setting her afloat; and it seems to be assumed as a settled principle, that there is to be no contribution, unless the ship is eventually saved.

The language of the *Rhodian* law leads very strongly to this conclusion, and this is the text upon which most of the authorities are founded. *Amissa navis damnum collationis consortio non sarcitur per eos qui merces suas naufragio liberaverunt: nam hujus æquitatem tunc admitti placuit, cum jactus remedio cœteris in communi periculo, salva navi, consultum est.* (*Dig.* 14. 2. 5.) There is nothing in any part of the *Lex Rhodia de Jactu*, which countenances the idea of average, when the ship is lost, and yet the authority of some respectable *Dutch* civilians is in favour

of contribution, not only if the vessel be voluntarily run ashore and injured, but if she be totally lost; and this contrariety of opinion cannot but excite some doubt and embarrassment, in searching for the true rule on this occasion. *Voet*, in his commentaries on the *Roman* text, (*Com. ad Pand. lib.* 14. tit. 2. s. 5.) speaks of the rule of contribution as applying to this very case of a ship run ashore, after consultation, for the preservation of the cargo, and the ship lost. *Bynkershoeck* (*Quæst. Jur. Priv. lib.* 4. c. 24. *de Jactu*) leaves us to infer, that, in his opinion also, the cargo ought to contribute, in a like case; and he cites and condemns a decision of the maritime judges of *Amsterdam*, in which they say that there is to be no contribution, unless the ship so voluntarily run ashore, be saved. This opinion of the *Dutch* judges, I still apprehend, contains the true construction of the *Rhodian* law; and it is to be observed, that *Bynkershoeck* does not clearly distinguish between the case of a ship that is voluntarily run ashore and saved, and one that is run ashore and lost; and perhaps the ordinance of *Philip* II. to which he and *Voet* refer, may have been thought to have applied the rule of contribution to this latter case, though I cannot read it in that ordinance as given us by *Magens*. The *Prussian* ordinance of *Konigsberg* is the only one which lays down such a rule, and that, like the opinion of *Voet*, is expressed in terms not to be mistaken; for it says that " if the master, for saving the cargo, and preventing greater damage, shall, after the usual consultation, designedly run the ship ashore, and thereby the cargo is saved, but the ship utterly lost and beaten to pieces, the average contribution shall remain good, and the goods thus saved contribute to the ship." (*Magens on Insurance*, vol. 2. p. 200.) But notwithstanding the weight which these cases or opinions may justly deserve, I am persuaded that they have arisen from a misapplication of principle, for the general doctrine and language of the marine law is undoubtedly otherwise, and the evidence of this appears in the most authoritative treatises which we have upon the subject. They either expressly assert, or evidently imply, that if the ship be stranded and lost, (no matter by what means,) it is not a case of general average, and that such average applies only to the partial damages which the rescued ship sustains by an act done for the common safety. (*Cleirac sur Jugemens d'Oleron*, p. 42. *Le Guidon*, c. 5. art. 28. *Ord. de la Marine*, tit. *Des Avaries*, art. 6. Tit. *Contrib.* art. 15, 16. *Valin*, tom. 2. 168. *Huber's Prælec. ad Pand.* lib. 14. tit. 2. s. 4. *Emerigon*, tom. 1. p. 614. 616. *Roccus de navibus et naulo,*

ALBANY,
Jan. 1812.

BRADHURST
v.
COL. INS. Co.

not. 60. *Ord. of Rotterdam*, art. 101. *and of Copenhagen*, tit. *Average*, art. 5.) We cannot have recourse to better sources for the principles of the marine law on the subject of contribution; and as far as the *English* writers have alluded to this question, they have adopted the same ideas. (*Malynes*, 110. *Molloy*, b. 2. c. 6. s. 12. *Beawes*, tit. *Salvage, &c. Marshall*, 537, 538.) Nothing can be more clear and explicit than the language of *Emerigon;* " the damages (he observes) resulting from the stranding of the ship, if the stranding be done voluntarily, for the common safety, are general average, *provided always, that the ship be again set afloat ; for if the stranding be followed by shipwreck, then it is save who can.*"(*a*)

These authorities are founded on sound principles, for the loss of the ship, in these cases, is more imputable to casualty than design.

When a ship is voluntarily run ashore, it does not, of course, follow, that she is to be lost. The intention is not to destroy the ship, but to place her in less peril, and if she afterwards goes to pieces, or is otherwise lost, it is not to be attributed exclusively to the act of the master, but to the direct, and more immediate operation of other causes. In most cases, he has no expectation, and certainly no intention, of destroying the vessel. He does an act hazardous to the vessel and cargo, in order to escape from a more pressing danger, as a storm, or the pursuit of an enemy, or pirate. The stranding may be an act done for the common safety, but this cannot be said to be the case of the subsequent shipwreck or capture. Indeed, the very act of running a ship ashore is desperate, and places the cargo in extreme jeopardy ; and if it happens that the ship be lost, and the cargo saved, it is saved *tanquam ex incendio*, according to the allusion in the *Rhodian* law. In such a case, it is emphatically said to be " save who can;" and to burden the rescued cargo with contribution for the ship, would seem to be oppressive, and is clearly not within the policy and equity of the rule.

The court are, accordingly, of opinion, that there is no contribution in this case, and that the plaintiffs are entitled to recover as for a total loss.

Judgment for the plaintiffs.

(*a*) The same rule is laid down in the new *Commercial Code of the French Empire*, which has been recently translated by a learned *American* jurist. It is there stated, (art. 425.) with the precision and brevity for which the *French* codes are distinguished, that " the cargo does not contribute for the ship, if she is lost or rendered unfit for sea."