[Philadelphia, April 1st, 1839.]

## MEECH and Others *against* ROBINSON.

If a vessel be on a lee shore in a heavy gale, and the captain find it necessary for the pre-
servation of the lives of the crew to run the vessel ashore, and accordingly they slip the
anchor and put the vessel before the wind and she strikes the shore and is lost, and it
appears that she would have gone ashore at all events, it is not a case of general average.

This was an action of assumpsit for money had and received,
brought by Asa B. Meech and others trading as A. B. Meech & Co.
and William Currie, against Edward W. Robinson.

The plaintiffs were the owners of a brig called the Tallahassee,
which was chartered by the defendant for a voyage from Phila-
delphia, where she was lying, to the port of Tampico. The vessel
was stranded on her outward voyage, and the proceeds of what was
saved, received by the defendant, and this action was brought to
recover the proportion of general average, to which the plaintiffs
alleged that they were entitled.

On the trial before Sergeant, J., at a Court of Nisi Prius, held in
Philadelphia, on the 7th of December, 1838, the plaintiff gave in
evidence the deposition of Edward Walford, the master of the ves-
sel, taken under a commission to New York, the material parts of
which were as follows:

" The vessel cleared for Tampico on the 14th of August, 1837;
she proceeded safely on her voyage till the 5th September follow-
ing, when she met with rough and tempestuous weather, in conse-
quence of which she sprung the spokes of her wheel and split the
barrel thereof. On the 6th of September (the next day) obliged to
bear away to make repairs, and to get water, having only one cask
of water on board for the supply of ten men. On the 7th September,
completed repairs and obtained a supply of water, and proceeded
to sea; nothing material happened till the 16th September, at 5
hours 30 minutes, P. M. when we came to anchor off Tampico bar,
in ten fathoms water. On Sunday, 17th September, at 7 A. M. a pilot
came on board and refused to take the brig in, alleging that there
was too heavy a sea on the bar. The pilot, however, ordered the brig
to be got under way, and to proceed nearer the mouth of the river;
the pilot then went on shore. After the pilot departed he (the wit-
ness) ordered the topsail and mainsail to be double reefed, and then

(Meech *v.* Robinson.)

furled all the sails; at noon that day had stiff breezes from the east-ward and hazy weather. At 7 o'clock P. M. same day, experienced a heavy squall from the north to north north-east, when it blew so heavy that the brig could not carry sail; in fact no canvass could stand the storm; witness then ordered anchor paid out to the better end of both chains—at the same time a very heavy sea sweeping the decks fore and aft. Witness then sent a man up to send down the fore royal yard, but the storm was so violent that the man was swept out of the rigging into the sea, and was drowned. At 9 o'clock, P. M. the wind at N. E., brig drifting very fast—let go the kedge anchor, and veered out hawser. At 10 o'clock A. M. parted the hawser and small chain, brig still drifting, and the wind at N. E. and being on a *lee* shore, where we could not carry sail, found it necessary for the preservation of the lives of the crew, (as the loss of the vessel was *now* beyond doubt, being in four fathoms water and the land within a mile of the brig,) to run the vessel ashore, and accordingly we slipped the best bower chain, put the brig before the wind, and at about ten minutes after two o'clock she struck. At the time the brig struck, she was under double reefed foretopsail and mainsail. As soon as the brig struck, witness ordered more sail on the vessel to drive her well up on shore. At daylight cut away our masts, and found the brig a quarter of a mile from the shore, in four feet of water, buried in sand five feet. The boats were then launched, and immediately swamped with two men, who escaped with diffi-culty by swimming ashore. Rafts were now made; and after lash-ing the men to the rafts the crew reached the shore."

On his cross-examination the witness said: " Her situation was most desperate: she would have gone ashore at all events. The mode in which witness ran ashore saved the lives of the crew, and tended to save a larger proportion of the cargo. If she had not been run ashore, the crew would have been lost, with probably all the cargo of the brig."

The jury found a special verdict as follows:

" We find that the plaintiffs were the owners of the brig Talla-hassee, which was chartered by defendant to sail from Philadelphia to Tampico, and was lost on her outward voyage, in manner described in the deposition of Edward Walford; the facts stated in which the jury find: The interests were as follows:

| | | | | |
|---|---|---|---|---|
| Vessel | . | . | $6,500 | 00 |
| E. W. Robinson | (Invoice) | . | 13,742 | 28 |
| P. L. & E. Laguerenne | " | .. | 16,876 | 63 |
| G. Follen & Cuesta | " | . | 5,770 | 72 |
| J. W. Odenheimer | " | . | 1,200 | 00 |
| | | | | |
| Being altogether | . | . | $44,089 | 63 |

The vessel and cargo were condemned and sold, and the proceeds of salvage for the benefit of whom it might concern, amounting to $1263 75, were received by the defendant. If the Court are satisfied from the testimony that the plaintiffs, as owners of the vessel, are entitled to contribution and general average, then a verdict to be entered for the plaintiffs for the sum of ($720 07) seven hundred and twenty dollars seven cents; otherwise a verdict for the plaintiffs for the sum of one hundred and eighty-six dollars thirty-one cents, ($186 31.)"

Mr. *H. M. Phillips* for the plaintiffs, cited *Sims* v. *Gurney*, (4 *Binn.* 513.)  *Gray* v. *Waln*, (2 *Serg. & Rawle*, 29.)  *Caze* v. *Reilly*, (3 *Wash. C. C. Rep.* 298.)

Mr. *M'Call* for the defendant, cited *Walker* v. *The U. States Insurance Co.*, (11 *Serg. & Rawle*, 60.) 2 *Phillips's Ins.* 238. *Stevens on Average, &c.* 143; 1 *Emerigon*, 614.  *Roux* v. *Salvador*, (3 *Bingh. N. C.* 266; *S. C.* 32 *Eng. Com. Law Rep.* 110.)

The opinion of the Court was delivered by

KENNEDY, J.—The case before us does not seem to come within the principle of any of the cases cited by the counsel for the plaintiffs. *Sims* v. *Gurney*, (4 *Binn. R.* 513,) has been relied on. It would be sufficient, however, to say that that case was not one where the ship was wrecked, or any apprehension entertained that she was in danger of being so, but a case merely where she, as it was firmly believed, about to be unavoidably driven on shore, *without the least risk of being wrecked* by it, was, for the purpose of conducting her to a place where the *crew* and *cargo* alone, not the vessel, might be saved with greater certainty, voluntarily stripped of her masts, together with the sails and rigging appertaining thereto. It may also be observed, that the correctness of the decision in this case has been questioned; and the authority of it, though no ways applicable to the present case, shaken at least, if not overruled by *Walker* v. *U. States Ins. Co.* (11 *Serg. & Rawle*, 60.)  The sacrifice of the masts, sails and rigging of the vessel, being voluntary, and determined on with a view to save the cargo, as well as the lives of the crew, may perhaps have been the subject of general contribution, but beyond this, the principle of the case may well be doubted. *Gray* v. *Waln*, (2 *Serg. & Rawle*, 229,) has also been cited by the counsel for the plaintiff.  The only matter, however, settled in it was, that a *voluntary* stranding of the ship for the purpose of preserving the ship and cargo, the greater part of the cargo being thereby saved, but the vessel wholly lost, entitled the owners thereof to general average for this loss.  The case of *Caze* v. *Reilly*, (3 *Wash. C. C. R.* 298,) which is to the same effect, and was decided

(Meech v. Robinson.)

before *Gray* v. *Waln,* was also adduced in support of the plaintiffs' claim. But the stranding of the vessel, in each of these two last cases, being considered as clearly *voluntary*, presents at once an obvious difference between them and the present. In the former, for aught that appears, the vessel might have been kept out at sea and have weathered the storm, so that the act of running them ashore, was purely one of free agency on the part of the masters, the agents of the owners thereof, and done for the common benefit of all concerned; thus bringing these cases within the reason of the rule, which lies at the foundation of every case of general average. The principle of general contribution, in this respect, is derived from the ancient law of *Rhodes*, relative to jettison, which it is said, was formed and promulgated nine hundred years before the Christian era, and afterwards adopted by Justinian into his Digest, with an express recognition of its true origin: " *Lege Rhodia cavetur, ut, si levanda navis gratia jactus mercium factus sit, omnium contributione sarciatur, quod pro omnibus datum est.*" *Dig. lib.* 14. *Tit.* 2, 1. Besides, where the property of one of the parties concerned in the adventure, is *deliberately* sacrificed for the benefit of the others, so that thereby *his* loss is made directly to promote *their* gain, he becomes entitled to claim restitution, according to the equitable maxim of the civil law, *Nemo debet locupletari aliena jactura.* And doubtless it is a general rule, constituting a part of the law of every commercial country, which has been acknowledged and acted upon from time immemorial, that if a part of the ship or cargo is *voluntarily* sacrificed to save the remainder from some impending danger, the owners of what is saved must contribute for the loss. 1 *Phillips on Ins.* 334. To this rule, however, there are some exceptions, as where goods, for instance, on deck, are thrown over, it is held in general, that no contribution can be claimed. *Ibid.* 332. But it is clear that the case in hand does not fall within either the terms or the reason of the rule. The running of the vessel ashore here, can with no propriety be said to have been voluntary. Nor can it indeed, be well said, that the loss of the vessel was occasioned thereby. For according to the evidence of the master, which is all that we have, and all that the plaintiffs' rely on to establish their claim, the vessel being on a lee-shore, where she could not carry sail, they found it necessary *for the preservation of the lives of the crew, as the loss of the vessel* was then certain beyond a doubt, being in four fathoms water, and the land within a mile of her, to run her ashore; and accordingly they slipped the best bower chain, put the vessel before the wind, and in a short time struck the land. In his cross-examination he further states, that her situation *was most desperate;* that she would have *gone to the shore at all events;* but the mode in which the witness ran her on shore saved the lives of crew, and tended to save a greater proportion of the cargo. From this it is perfectly manifest, that the loss of the vessel had become

*inevitable*, as the consequence of the peril then present; and' in such case says Mr. Phillips in his treatise on Insurance, 1 vol. 339, when the acts of the crew are intended to alleviate, instead of avoiding such consequence, it seems hardly to be voluntarily incurring a loss. But Mr. Benecke in his work on Insurance, cap. 5, p. 219, in which, says Chief Justice Abbott, in his publication on Shipping, 343, there is much learning combined with practical experience, meets the present case in so many words, and declares, that "if the situation of the vessel were such as to admit of *no alternative*, so that without running her ashore, she would have been *unavoidably lost*, and that measure were resorted to for the purpose of *saving the lives or liberty of the crew*, no contribution can take place, because *nothing in fact was sacrificed.*" So here the plaintiffs sacificed nothing; their vessel was doomed to *inevitable* destruction, by the peril of the sea which surrounded her. It was, in reality, the case of a wreck, where as *Emerigon*, *tom*. 1, p. 612, says, "The owner of the ship wrecked, and the owner of the merchandize lost in the shipwreck, have no right of contribution from those who have the good fortune to save their effects; because the losses that the one or the other has sustained, has not procured the common safety. The rule of the civil law is the same. *Amissa navis damnum, callationis consortio non sortitur per eos qui merces suas naufragio liberaverunt; nam hujus equitatem tunc admitti placuit, cum jactus remedio, cæteris in communi periculo, salva navi, consultum est.* (*Lib.* 5, *de Leg. Rhod.*) It is the same as the case of fire. He who saves his own, saves for himself alone. *Cum depressa navis aut dejecta est, quod quisque ex ea suum servassat, sibi servare respondit, tanquam ex incendio.* (*L.* 7, *ff. cod.*) So *Cleirac* (*p.* 51, *note* 9,) says, "after shipwreck, there is no contribution between the merchandize recovered and fished up, and those lost; but save who can." So *Casaregis* says, (*Disc.* 121, *note* 17,) "he who saves, saves; he who loses, loses." See Mr. Justice Story, note 1, to *Abbott on Shipping*, 349. The loss of the ship in question, appearing then to be *inevitable*, must therefore be borne by the plaintiffs, who were owners of her. This says Mr. Stevens, the Digest and all authors are agreed on; for you cannot in equity convert *a loss*, which is inevitable, into *a claim*, for the preservation of property. *Stevens & Benecke*, by *Phillips*, *on Average*, 84.

The judgment therefore, according to the agreement of the parties, must be for the less sum in favour of the plaintiffs, that is, one hundred and eighty-six dollars and thirty-one cents.

Judgment accordingly.