JOHN F. SLATER AND OTHERS *vs.* THE HAYWARD RUBBER COMPANY AND OTHERS.

To constitute a right of general average for goods jettisoned, there must concur, 1st. A common peril affecting vessel and cargo ; 2d. A voluntary sacrifice of the part jettisoned, for the safety of the remainder; and 3d. The deliverance thereby of the remainder from the peril.

Where goods on the deck of a propeller were on fire, causing imminent peril to vessel and cargo, and certain to be themselves consumed, and were thrown overboard, and the vessel and remainder of the cargo saved thereby ; it was held, in dismissing a bill brought for contribution upon a general average of the loss : 1. That the loss could not be attributed to the jettison, as the goods were already of no value by reason of the certainty of their destruction by fire. 2. That for the same reason, they could not be regarded as voluntarily

sacrificed. 3. Nor as selected for that purpose, (which is involved in the idea of a voluntary sacrifice) since their own condition made it necessary that they should at once be thrown overboard. 4. Nor as ejected so much to deliver the remainder from a common peril, as to remove the very cause of peril. 5. That the fire did not constitute a peril of the class intended by the commemial law as a ground for general average.

Whether, if the case were in other respects one for a general average, the owners of goods under deck would be liable to contribute, the goods jettisoned having been stowed on deck: *qu.*

By the ancient rule, as well established, they would not, but whether modern usage has modified the rule : *qu.*

THIS was a bill in chancery brought to the superior court for New London county for a contribution upon a general average of a loss caused by a jettison of goods. The case was referred to a committee, whose report embraced the following facts.

The goods were stowed on the deck of the steam propeller Charles Osgood, which then plied regularly through Long Island Sound between New York and Norwich, touching each way at New London, and which left the former city, with a large cargo, including the goods above mentioned, on the 3rd day of April, 1855. The goods owned by the respondents were stowed under deck. There were no passengers. About one-third of the main deck aft was covered by a cabin, the remaining two-thirds being protected by high bulwarks. It was the custom of the owners of the propeller and of others engaged in transporting merchandize in propellers on this route, to stow goods of the character of those constituting this cargo on or under deck according to their convenience, and with no difference in the price of freight, and this custom was known to all the parties in this case. And it was found that in this instance the deck load was not a serious inconvenience in the navigation of the vessel, and in the state of the weather was not in danger of loss by the perils of the sea, and that it was not on these accounts an act of imprudence to attempt to carry it in that manner.

The propeller left New York at 4 o'clock in the afternoon, and had proceeded about 16 miles on her way, when it was discovered that a part of her deck cargo was on fire. The

fire was the result of spontaneous combustion or caused by a spark from the steamer's pipe. Orders were immediately given to throw water upon it, and also to throw the deck load off to prevent the fire from extending, but it had made such progress that the crew could not control it, and it was apparently impossible for them to save the cargo and vessel except by scuttling her. At that time the steamers Worcester, Plymouth Rock and Bay State, which left New York at 5 P. M. arrived in the vicinity, and came to her relief, sending their crews and hose on board and assisting in throwing the deck load into the sea. In about two hours they succeeded in subduing the fire, when one of the steamers took the propeller in tow and towed her to New London.

It was found that the captain and crew acted with ordinary care and prudence in their attempts to extinguish the fire after it was discovered; that the jettison of the deck cargo was directed by the captain, and was necessary for the safety of the vessel and cargo; and that nearly all the goods thrown over were in a burned or burning condition, and would all have been burned unless so thrown over. A part of the cargo thus thrown into the sea, was afterward picked up in a damaged condition.

It was further found that there was no particular usage or custom in relation to the adjustment of average upon any of the lines of navigation between ports in this state and Rhode Island or New York, through Long Island Sound; but that so far as it appeared that any such adjustments had been had, they were based upon the rule of mercantile law, to some extent if not generally received in this country, that goods under deck are not liable to average and contribution in favor of goods carried upon deck and jettisoned: and that it is the custom of insurers in this state and Rhode Island, and in the country generally, to charge from two to five fold more premium on insurance of goods carried on deck, than upon goods carried under deck; which custom is based not only on the greater danger from the sea and fire, to which they are subject, but also on the supposition that the rule is generally recognized that they are not entitled to

contribution and average when jettisoned; that the insurance offices in taking risks, do not deem goods carried on deck "lawful cargo;" that they are not considered as included in a policy, unless described as on deck; and that when a bill of lading is presented, and insurance sought upon the goods, if the bill does not describe them as on deck, they are understood to be under deck only, and insured accordingly. And it was found that this usage of the insurers is applied to steamboats and propellers as well as sailing vessels, with a difference only in rates of premium, and whether navigating Long Island Sound, or elsewhere.

The petitioners objected to evidence of the usage stated and the evidence was received subject to the objection.

The case was reserved on the facts so found for the advice of this court.

*E Perkins* for the petitioners.

1. In order to constitute a case for general average, three things must concur; 1. An imminent danger to ship, cargo and crew, and apparently inevitable except by incurring the loss of a portion of the whole to save the remainder; 2. There must be a voluntary jettison or sacrifice of some portion of the whole for the purpose of avoiding such inevitable danger; 3. The attempt to avoid the imminent common peril must be successful. *Barnard* v. *Adams*, 10 How., 270. 2 Phill. on Ins., 71 to 76. All these facts are expressly found by the superior court to exist in this case.

2. The fact that the goods jettisoned were laden on deck, if in accordance with the usage and custom of this particular trade, and that known to all the shippers, will not exclude the owners of the goods so sacrificed from the benefit of the law of general average. 2 Phill. on Ins., 71, 76. *Gould* v. *Oliver*, 4 Bing. N. C., 134. *Milward* v. *Hibbard*, 3 Ad. & El. N. S., 120. *Dajost* v. *Edwards*, 4 Camp., 142. Abbott on Shipping, 581, 2. 2 Arnold on Ins., 888. 1 Park on Ins., 284. *Lyon* v. *Alvord*, 18 Conn., 66, 74. In this case the known usage in the manner of loading, places all the various parties in interest in the same situation as if they were vol-

untary causing their goods to be transported in a carrier ship built without a deck. This class of propellers is constructed for the purpose of carrying deck loads. They have high bulwarks; the voyage occupies but few hours; the vessel has the aid of both sails and steam. Knowing all these facts, all the parties in interest have chosen to engage in this trade as shippers and carriers. They stand in the same light before the court as if they had all been on board the Charles Osgood, when she lay at the dock in New York and had then all united and agreed in loading the goods just as they were laden and had started with them on board the propeller for the port of Norwich.

*Hovey* and *Halsey*, for the defendants.

1. The essentials of a general average loss, all of which must concur to bring it under the rule, are 1. A common peril impending at the time; 2. A voluntary loss, or sacrifice of some property, for the purpose of saving other property; 3. The success of this endeavor. The loss must be voluntary, and if the peril of any one whole thing is such that its preservation is impossible, the destruction of it, in a way to insure the safety of the rest, is not such a voluntary loss or sacrifice as would give a claim for indemnity. The loss can not be said to have been voluntary, where the property at the time was within the grasp of a peril from which it could not have been extricated, or where the disaster is fatal and nothing remains to be sacrificed, or where its destruction from existing causes is only anticipated. Pars. Mer. Law, 367, 368, 479. *Whitteredge* v. *Norris,* 6 Mass., 125. *Nickerson* v. *Tyson,* 8 Mass., 467. *Crockett* v. *Dodge,* 12 Maine, 190. *Marshall* v. *Garner,* 6 Barb., 394. *Walker* v. *U. S. Ins. Co.,* 11 Serg. & R., 61. *Meech* v. *Robinson,* 4 Wharton, 360. Benecke on Average, 283.

The loss in this case was properly a fire loss; and, as such, would be covered by an ordinary marine or fire policy. Pars. Mer. Law, 446, 526. *Case* v. *Hartford Ins. Co.,* 13 Ill., 676, 680. *City Fire Ins. Co.* v. *Corlies,* 21 Wend., 367. Angell on Ins., § 115, 118. It was also a loss for which the

carrier would be liable at common law.    Pars. Mer. Law, 214.    *Hale* v. *N. J. Steam Nav. Co.*, 15 Conn., 539.    Angell on Carriers, § 157, 158, 159.    *Garrison* v. *Memphis Ins. Co.*, 19 How., 312.    The effect of the petitioner's claim is, to make co-shippers co-insurers against fire.

2. If goods carried on deck are jettisoned, they are not to be contributed for.    3 Kent's Com., 240.    Pars. Mer. Law, 370. Abbott on Shipping, 482, and note *f.*    *Smith* v. *Wright*, 1 Caines R., 43.    *Lenox* v. *United Ins. Co.*, 3 John. Cas., 178. *Dodge* v. *Bartol*, 5 Green., 286.    *Cram* v. *Aiken*, 13 Maine, 229.    *Sproat* v. *Donnell*, 26 Maine, 185.    *Taunton Copper Co.* v. *Mer. Ins. Co.*, 22 Pick., 108.    *Hampton* v. *Brig Thaddeus*, 4 Martin, 582.    *Doane* v. *Keating*, 12 Leigh, 391. *Johnston* v. *Crane*, 1 Kerr, (N. Bruns.,) 356.    This rule has been adopted in America as a universal one, and the business of insurers and shippers is regulated with reference to it.    It is important that the rule in such cases should be uniform. *Nickles* v. *Maine Ins. Co.*, 11 Mass., 253.    If goods are properly stowed upon deck according to the usage of a particular trade, and thrown over for the general benefit, there is no claim against the carrier for stowing them in that manner, nor against the other shippers for contribution, even though full freight is paid.    See the cases above cited; also, *Lawrence* v. *Minturn*, 17 How., 100.    Some modern cases in England have held the ship owners liable to a contribution in such instance, but no case has extended it to the other shippers.

3. A general policy does not cover deck cargo.    *Taunton Copper Co.* v. *Ma. Ins. Co.*, 22 Pick., 108.    The usage is proved to be universal in this respect.    The reason is, that the risk is greater, and that such goods are not contributed for.

4. The evidence offered of usage in these respects was admissible.    It was of usages common to the general trade.    2 Green. Ev., § 250.    Usages should be general in a given trade, and co-extensive with the state at least.    *Notes to Wiggleworth* v. *Dollison*, 1 Smith's Lead. Cas., 300.

5. The custom of stowing goods on board this vessel is an

unreasonable one.   A usage to be legal, must be reasonable;
and that usage can not be, which puts at hazard the property
of the owners at the pleasure of the master.   2 Pars. on
Contr., 58.   *Bowen* v. *Stoddard*, 10 Met., 375.   *Bryant* v.
*Commonwealth Ins. Co.*, 6 Pick., 131.   No insurance office
would take a risk on a deck cargo stowed as this was
proved to have been.   An insurer of goods on deck would
not be bound by any such stowage, although it was proved
to have been according to custom.   What is a legal custom
is a question of law   *Bottomly* v. *Forbes*, 5 Bing. N. C., 121.
1 Duer on Ins., 269.

ELLSWORTH, J.   The material facts upon which a majority
of the court place their decision of this case are the fol-
lowing.

The petitioners and respondents, (except the Merchants'
Transportation Company, who are the owners of the pro-
peller Charles Osgood) were the owners respectively of the
cargo shipped on board of said vessel, consisting of cotton,
wool, rags, India rubber, leather, and other merchandize.
The cargo was placed indiscriminately on the deck of the
vessel and in her hold, as is the usual and customary prac-
tice in vessels of this description engaged in this species of
transportation.   The propeller left New York for New Lon-
don and Norwich, on the 3rd day of April, 1855.   When she
had proceeded about three miles east of Throggs' neck, her
deck cargo took fire, as is supposed from spontaneous com-
bustion or the falling of a spark from the chimney.   It
became necessary, in order to save the deck cargo as well as
the cargo under deck and the vessel, to cast the burning
cargo overboard into the water.   By this ejection the fire
was subdued, and the vessel saved, as well as all the cargo
under deck and certain portions of that which was thrown
overboard.   The court find as a fact, " that most of the cargo
thrown overboard was burned or burning, and all of it would
have been burned and entirely lost, had it not been ejected
as already stated."   There were steamboats near by at the
time of the fire, which came to the relief of the propeller and

picked up and saved to the owners whatever of said property was rescued from the fire and the water. It is for what was thus lost or injured, that this petition is brought against these respondents for a contribution, on the ground that the cargo which was lost, was sacrificed to save the rest, or is what is denominated in the books a loss by jettison.

Two questions are made : is this a jettison ; and if it is, how does the circumstance that the cargo lost was on the deck of the vessel affect the case.

The last question we shall not now consider, because, we deem it of too much importance to be passed upon without a careful and elaborate examination of the law as it exists at this time, and because we do not think it necessary in the disposition of the case, as a majority of the court are quite satisfied upon the first question that the petitioners have no equity in their bill.

Before however we pass to a consideration of the first question, I will remark in relation to the second, that according to the ancient law as laid down in the commercial codes of Europe, in the elementary books and the decided cases in England and in this country, a distinction was always made between cargo on deck and under deck, and that when that which is on deck is thrown overboard, to avoid some common peril of the sea, which threatens destruction alike to all, the owners of what was under deck can not be compelled to make contribution as for a loss by jettison for what was carried on deck. But it is said that the ancient law is materially changed and that there are cases in our books and in our more recent elementary writers, which assert that it makes no difference whether the cargo is carried on or under deck, if it be carried in the customary and usual manner. It is said too that there are considerations which strengthen this view of the law, growing out of the construction of this class of vessels, and out of the present mode of transportation through Long Island Sound, if not elsewhere. But as I said we leave these grave questions without any decision or intimation what might be our opinion upon them. See *Lawrence* v. *Minturn*, 17 How., 100, 110.

As to the main question then. The rule of the Rhodian law, to which all jurists refer for authority when speaking of jettison is this : If goods are thrown overboard in order to lighten a ship, the loss incurred for the sake of all, shall be made good by the contribution of all. This rule or example of a rule, is found in all the elementary books and is declared to be, as it obviously is, founded in the highest equity and natural justice. It would be highly inequitable that the property of one man should be voluntarily sacrificed to bring safety to that of others involved in a common peril, without giving to the former a right to call on the latter to contribute in proportion to the benefit received.

By this rule it will be seen that several things are indispensable to make a loss by the ejection of cargo a proper and equitable jettison. First, there must be a common peril threatening the destruction of vessel and cargo; second, the sacrifice must be voluntary and of selection, as distinguished from an involuntary and unavoidable loss from causes beyond human control; and third, it must appear that the goods sacrificed were the price of safety to the rest. Let these characteristics be applied to the loss in question, and we are satisfied it will be found that there has been no proper jettison, and no right for an equitable contribution, if we are right in the view we take of the facts.

It appears by the finding that the goods claimed to be jettisoned were in a burned or burning condition, and that if any were not burned or burning, they would certainly have been burned had they not been cast into the sea. We say then that the loss did not arise from the jettison, but was to all intents and purposes complete and absolute before the jettison. The goods had ceased to be of value unless the fire upon them could be extinguished by the water, and that could be done only by casting them into it, as was in fact done. They were thrown overboard of necessity, not of choice or selection, that they might be saved from themselves, if I may so express myself, from the fire which was in them and upon them. The very act which is said to be the sacrifice, of destroying a part in order to bring safety to the

rest, is the very act which saved whatever of value was saved
to the owners, of the part claimed to be sacrificed.   The
water into which they were thrown extinguished the flames,
and the boats which came to render assistance picked up the
goods and saved what otherwise had been totally lost to
their owners.   It is possible that a small part of the cargo
on deck was not yet on fire, but most of it certainly was, and
the petitioners in their bill say that it all was, so far as could
be seen, and after the finding of the court of the extent of the
loss by the fire, we do not feel called upon to discriminate
between the mass which was on fire, and the little that
might not have been, were we able from any evidence before
us to make such discrimination.   The whole deck cargo was
involved in one unavoidable ruin, and not a particle of it
could have been saved or was saved, but by the ejection of
it into the sea.   If the vessel, and cargo under deck, were
benefited, as they doubtless were, by getting the fire out of
the vessel, it can not in any just sense be said to be by a
voluntary sacrifice of a part to save the rest, but rather by
being delivered from a nuisance; as part of a cargo of spoiled
fruit or corrupted fish, caused by the leaking of the vessel, is
cast overboard to save the crew, the vessel, and the voyage,
from their deleterious and destructive effects.   Indeed, I think
it may be said that the fire had as effectually destroyed the
deck cargo in the one instance, as the decay or putridity of
the fruit or fish had destroyed that part of the cargo in the
other.   The truth is, the only effect and purpose of this mis-
named jettison, was to rescue whatever could be rescued from
this local and partial peril, and not to sacrifice a part equally
entitled to be saved, in order to afford deliverance and safety
to the rest.

   In the next place, we say, if there has been a loss by the
throwing overboard, it was not a voluntary sacrifice of part
to save the rest.   There was no room to exercise choice, or
election, or even deliberation.   The goods were on fire, and
they, of all the cargo, must be cast into the sea; the safety
of the crew, vessel and cargo required it.   The captain would
have been in fault and responsible if he had acted otherwise.

The crew could have done it without his advice, or concur-
rence, and so could the passengers, if there had been any,
and any body else who had access to the vessel. It is then,
no thing of choice, selection, deliberation, or free and volun-
tary action. If the fire was let alone it would set the vessel
on fire, for like putrid fish, the goods in a burning state,
having the cause of destruction within themselves, would, if
not thrown overboard, have destroyed everything about them.
The reason assigned why a deck cargo thrown overboard in
a storm for the general safety can not call for a contribution,
is, because such a cargo incumbers the vessel and renders it
more difficult of navigation. How much more is this true
of a deck cargo on fire? It must, as we say, be instantly
cast into the sea, or it will render the vessel unnavigable and
spread universal destruction through it. In *Crockett* v.
*Dodge*, 12 Maine, 190, the court decided, that in the case of
a voluntary sacrifice of a cargo of lime, for the preservation
of the vessel by scuttling her, the owners of the lime had no
claim on the owners of the vessel for a contribution, if at the
time of the sacrifice of the cargo there was no possibility of
saving it. In that case the vessel was loaded with lime,
which got on fire in the hold; some of it was taken out and
saved, but the rest could not be saved, and the vessel was
scuttled at the wharf, to save her from being burnt. The
owners of the lime claimed contribution from the owners of
the vessel, as the latter was saved from the fire. Weston, C.
J., in giving the opinion of the court, says, " Benecke on Aver-
age, lays down the law to be, that if but for the voluntary
destruction of part, the whole would certainly and unavoida-
bly have been lost, no claim for contribution could be main-
tained, because a thing can not be said to have been sacrificed
which had already ceased to be of any value; but if there be
a possibility of saving the ship and cargo, and the master
deliberately resorts to this measure because he thinks it more
prudent to sacrifice a part, it is a case of general average.
If the lime in the condition in which it then was, could by
no possibility be saved, it was of no value, and the owner lost
nothing by the course pursued. Where the peril admits of

a selection, and the part destroyed might have been saved by the sacrifice of the part preserved, it is a case for contribution." The same doctrine is held in *Bradhurst* v. *The Columbian Ins. Co.*, 9 Johns., 9; there the ship was run on shore, but it was not held to be a general average loss. So in *Nickerson* v. *Tyson*, 8 Mass., 467. So in *Walker* v. *U. S. Ins. Company*, 11 Serg. & Rawle, 61. So in *Meech* v. *Robinson*, 4 Whart., 360. In the last case the court say, "the running of the vessel on shore can not with propriety be said to have been voluntary, nor can it indeed be well said that the loss of the vessel was occasioned thereby, for her loss had become inevitable in consequence of a peril then present." These cases fully sustain the doctrine laid down in 2 Phill. on Ins., 98, that where the acts of the crew are intended to alleviate instead of avoiding a loss, it seems hardly to be voluntarily incurring a loss. Benecke, Stevens, Abbott, and all the elementary writers, assert the law to be, that a loss which is inevitable can not be converted into a sacrifice for the preservation of property.

Now to me it seems little less than a paradox, that if a captain whose vessel is doomed to destruction by stranding, should consider and select, for his compulsory going ashore, the place least perilous to himself and vessel, and least destructive to what might happen to escape the general destruction, such preference is the incurring a voluntary sacrifice which entitles him to call for contribution. "Save himself who can," is a maxim much more applicable to such a case. When a captain finds that his vessel must go on shore, and he exerts himself to go on in a safer place rather than a more dangerous one, he no more makes a voluntary sacrifice, than when, in navigating his vessel, he chooses a safe channel rather than a hazardous one, or changes his course to avoid a rock or shoal. He does his plain duty to the general interest, to mitigate an unavoidable calamity, but not at all in any sense to make a loss by selecting a part to be sacrificed in order to ensure safety to the rest.

The true notion of a jettison is most frequently illustrated in cases of vessels throwing over some of their cargo to light-

en the ship, in order to draw less water, or hasten their flight when pursued by an enemy, or to ride out a storm, or reach a harbor of safety; and in such cases, the heaviest articles of the cargo should be selected and not the lightest or most valuable, as boxes of coins, jewels and the like, which shows that the doctrine of jettison should not be applied where there can be no choice or selection of what is to be sacrificed or jettisoned, as in the present case.

It is said by the counsel for the petitioners that the law of jettison, as now understood and practiced, is much changed and modified from what it once was, if indeed it ever was what the respondents claim it to be, and that the cases and elementary books at the present time show that unavoidable losses of a certain kind are notwithstanding held to be a voluntary sacrifice, and proper subjects for contribution. We are referred to the cases of *Columbian Ins. Co.* v. *Ashby*, 13 Pet., 331; *Caze* v. *Reilly*, 3 Wash., C. C. R., 298; *Sims* v. *Gurney*, 4 Binney, 513; *Gray* v. *Waler*, 2 Serg. & Rawle, 229, and especially to *Barnard et al.* v. *Adams et al.* 10 How., 270. In them it is said to be decided that an inevitable stranding of a vessel may be a voluntary act, and so a voluntary sacrifice, if at the moment of the loss, by the choice and efforts of the captain and crew, the time of stranding is hastened, or a place for stranding of less peril and danger, however contiguous, is selected as the place for the unavoidable catastrophe. Still, if such be the doctrine of these cases, which I do not concede, it by no means follows that they sustain the views of the petitioners in this particular case; and if such be the doctrine which they contain, I am by no means satisfied with it.

In the case of *The Hope*, 13 Pet., 331, the great question was, whether the vessel assumed to be totally lost, by a voluntary stranding, presented a case for a general or a particular average. The totality of the loss gave rise to the question which was chiefly discussed at the bar, and which made the great point in the decision of the court. The counsel for the plaintiffs there insisted that the rule of law is, that in case of a voluntary stranding, if the vessel is wholly lost and the

voyage broken up, there is to be no contribution; and they particularly urged the case of *Bradhurst* v. *The Columbian Ins. Co.*, 9 Johns., 9, as decisive of their case, which shows to my mind that the extent of the loss and not the character of it was the great point in dispute. The court decided in favor of the plaintiff, that it was not material whether in such a case, the vessel was totally lost, or was only injured and was afterward got off and pursued her voyage. The judge in giving the opinion, assumed that the stranding was voluntary, and said very little about that as a fact, or as the ground of a legal inference from facts. We doubt if Judge Story meant to extend the principle of that case to a case like the present, for he says, (page 343,) " It is not like the case of saving from a fire, *tanquam ex incendio,* save who can."

The case of *Barnard et al.* v. *Adams et al.,* 10 How., 270, comes much nearer apparently to what the petitioners claim the law to be. But it is not quite certain that the court, in deciding that particular case, meant to lay down the law so broadly as is now claimed, much less so broadly as to reach the present case, although Grier, J. in the course of what he says in giving the opinion of the court, does seem to lay down the law in very broad terms, and yet on page 302 he says, " The court below should not be understood as saying that if the jury believed the peril which was avoided was inevitable, or that if the jury believed that the imminent peril was not avoided, they should find for the plaintiff;" implying by this language, as it seems to me, that if the loss was inevitable, as by the fire in this case, there was no ground for an average contribution; leaving therefore untouched the great question, what degree of human agency in any particular emergency will convert a loss which, in the end is certain and inevitable, into a voluntary loss, in the eye of the law. The language of Daniels, J., who dissented, is very clear and explicit: "If (says he,) the stranding was resorted to merely for the purpose of saving the lives and liberty of the crew, the damage, even if the whole cargo is saved, is held to be particular average. This is the practice in all countries,—the same will, the same positive action, the same purpose, and it may be added, the same predicament or

position of the actors, must exist in each class of cases. There must be an intent and an act prompted by and tending to a practicable, or at least a probable result, and not mere endurance, or submission to uncontrolable necessity, in either case." I think it possible that I do not correctly understand the remarks of Judge Grier, but if I do, and he is to be understood as saying all that these petitioners claim he did, as the opinion of the judges, I must be permitted to inquire, how it is possible that where the loss of the vessel is absolutely certain and unavoidable, the momentary effort of the pilot or captain in giving the wheel another turn, or spreading a sail, thereby hastening the stranding of the vessel, or selecting a sandy beach rather than a rocky shore for the better laying of the vessel, converts a compulsory loss into a voluntary and chosen one ?

Then to apply what has been said to the present case, may we not well say that the ejected cargo of the Charles Osgood, burnt or burning, or in the same.condition from the same cause, was lost, so far as it was ultimately lost, before it was ejected, and not by reason of that act; that it was of no real or material value at the time, and certainly made of no less value by means of the act of jettison; and that the ejection of that specific property was scarcely an act of free will at all, and certainly not of free choice and selection. I feel confident that this is not a case of jettison, the selection of some part of the cargo standing on an equality with the rest, in order to save the rest from a common peril, but rather of special necessity and duty, a thing done to this particular part of the cargo to save it from itself, and to prevent its destroying the rest of the cargo and the vessel.

It remains that we consider whether the throwing over this burning cargo was an act done to deliver the general property from a common peril. We are much inclined to believe that a common peril is one which is from without, such as the sea, winds, waves, rocks, shoals, pirates, and the like. Certain it is, we have found no case of a different character; none arising from the state and condition of the cargo, as fruit or fish in a putrid state, whether it arises from the nature and inherent qualities of the cargo, or has been superinduced by

water getting upon it, from some cause wholly unavoidable and involving no fault in the carrier. It is doubtless true, in a sense, that a peril by fire threatens the whole property, but this is not enough to make the loss one of the peculiar character denominated a jettison. The peril is general, but the cause is not. The latter is special, local and peculiar, and when removed the rest remains uninjured and secure.

We may go further and say that the peril must be a sea peril. The books do not go beyond this class of perils, and we are not ready to say the rule can be extended further. This class of perils we have just enumerated under the head of common perils, such as the sea, &c., and fire is not one of them, as this court held in the case of the Lexington, which was burnt some years since in Long Island Sound; and the same law is laid down in numerous cases, and in every treatise on bailments in our libraries. We will refer only to *Airey* v. *Merrills*, 2 Curt., C. C. R., 8; Story on Bailments, § 512; 3 Kent's Com., 275; and a very recent case in the supreme court of the United States, not yet reported.* The case referred to has been decided by Judge McLean on the western circuit, in the case of a fire on board of a Mississippi steamer. Fire is by no means peculiar to the sea, and is no where called a sea peril, but is more common and peculiar to the land.

We need not remark that we consider the late act of Congress exempting common carriers by water from liability for losses by fire in their vessels, except in certain cases, as having no bearing on the questions in issue, as that statute governs only certain relations between the parties, but has nothing to do with the character and nature of a loss by jettison. We advise that the bill be dismissed.

In this opinion STORRS, C. J. concurred. HINMAN, J. concurred in the decision, on the ground that the loss did not arise from a peril of the sea, but did not concur in all the views expressed by Judge Ellsworth.

Bill to be dismissed.

---

* Garrison *v.* Memphis Ins. Co., 19 How., 312.