JAMES HUGHES, Appellant, *against* THE SUN MUTUAL INSURANCE COMPANY, Respondent.

(Decided March 15th, 1883.)

On the trial of an action by the owner of a vessel against insurers of her cargo of coal, it appeared, from evidence on the part of plaintiff, that the vessel, while navigating Long Island Sound, and when near her port of destination, was submerged by a storm; but before she sank, a buoy was attached to her bow by the master, so that she might easily be found. Plaintiff testified that he made an offer to the insurers of the vessel to abandon her to them, if they would pay as for a total loss; but they refused, intending to raise and carry her to the port of destination, which, under the policy, they were entitled to do " for the benefit of all concerned, and without prejudice to the rights of either party." It further appeared that defendants, who, as insurers of the cargo, had become subrogated to the rights of the owners of the coal, united with the insurers of the vessel in employing wreckers to raise the vessel for a specified sum, to be apportioned between the vessel and the cargo according to the law and usage of general average; that the wreckers raised the vessel and brought her, with the coal in her, to her port of destination; and that these defendants, denying the plaintiff's right to freight and his lien for it, and notwithstanding, as he testified, he forbade their taking away the coal without payment of the freight, directed the wreckers to sell the coal, which the latter did, and, after retaining out of the proceeds the proportion of their own compensation chargeable upon the cargo, paid over the residue to defendants. The evidence for defendants, however, was that they did not know, when joining with the insurers of the vessel in raising it, that the latter were acting

on plaintiff's behalf to save a total loss, and supposed they were raising the vessel to protect themselves from the full insurance; and defendants further endeavored to show an abandonment of the cargo by plaintiff to them, which, however, he denied. *Held,* that even if defendants supposed there had been an abandonment of both the vessel and cargo, and that by uniting with the insurers of the vessel, they were engaging for the recovery of the cargo they had insured, as property lost and abandoned to the owners and insurers, their mistake could not affect plaintiff's rights; that the conflict of evidence as to abandonment of the cargo by plaintiff to defendants presented a question for the jury, and the court could not assume, as ground for dismissing the complaint, that plaintiff had so abandoned the cargo and thereby relinquished the freight; but that, even upon the conflict in the evidence, there was no abandonment either of the vessel or cargo; that therefore, when the vessel was brought into the port of destination, plaintiff was entitled, after the wreckers were paid, to possession of her and her cargo, and, the cargo being then capable of delivery, he had a lien upon it for his freight; and if he lost his lien through the wrongful act of defendants, the injury being permanent, he could recover from them as his damages the amount of his lien and interest.

APPEAL from a judgment of this court entered upon the dismissal of a complaint.

The facts are stated in the opinion.

*Edward D. McCarthy,* for appellant.

*H. Kettell,* for respondents.

CHARLES P. DALY, Chief Justice.—I think the complaint in this case was erroneously dismissed. The general rule is, in respect to the carriage of goods by sea, that if they are delivered at the port of destination, however much they may be damaged, unless it arose from the act of the carrier, freight is earned (*Hugg* v. *The Augusta Ins. &c. Co.,*7 How. [U. S.] 595; *Griswold* v. *New York Ins. Co.,* 3 Johns. 322; 2 Phillips Ins. § 1643), and it would make no difference, I think, in the application of this rule in the present case, that the vessel was raised and brought with the cargo to the port of destination by the insurers of the vessel, in pursuance of a provision in the policy that entitled them to do so.

The policy between the insurers of the vessel and the plaintiff, who was her owner, provided that he "should not have the right to abandon her, except in the case of an absolute total loss, and that the acts of the insurers in recovering, saving and preserving the property insured, in the event of disaster, should not be considered as a waiver or acceptance of an abandonment; nor as either affirming or denying their liability under the policy; but as done for the benefit of all concerned, without prejudice to the rights of either party."

The vessel met with a disaster in a heavy storm upon Long Island Sound, within six miles of New Haven, which was the port of destination. She lost two planks from her bow, and sank in about forty feet of water.

The plaintiff, with the intention of abandoning her, submitted to the Buffalo Insurance Company, who had insured her to the extent of $1,200, proof of a total loss, but Mr. Carpenter, the general manager of the company, refused to receive it, telling the plaintiff that he could not abandon her, as the company intended to raise her, which they did.

The vessel was then simply derelict; that is, abandoned through an overwhelming necessity, having been sunk by force of the elements to the bottom of Long Island Sound, in the place where the disaster happened to her, a buoy having been attached to her bow before she sank, so that the spot where she lay might easily be found. This was not such an abandonment as would divest the owner of his property in the vessel, for that results only where an abandonment is made voluntarily by an owner with his free consent (1 Abb. U. S. Pract. 575; 2 Phillips Ins. §§ 1490, 1525, 1526, 1527).

The plaintiff was willing and offered to abandon her if his indemnitors would under the policy pay as for a total loss, which they would not and could not be required to do, as the vessel was merely submerged (2 Phillips Ins. §§ 1526, 1527).

They determined to raise and carry her into the port of destination, which they had a right to do, as the policy ex-

pressed it, "for the benefit of all concerned, and without prejudice to the rights of either party." If the underwriters had accepted the plaintiff's offer to abandon, and paid him as for a total loss, then, as the vessel was raised and brought with her cargo into the port of destination by wreckers employed by the insurers of the vessel and the insurers of the cargo, the latter having been subrogated to the rights of the owners of the cargo, the freight would be apportioned *pro rata itineris*, the owner retaining what was earned previous to the disaster, and that subsequently earned would go to those to whom the vessel was abandoned, and who brought her into port (*United Ins. Co.* v. *Lennox*, 1 Johns. Cas. 377; *Davy* v. *Hallett*, 3 Cai. 20; *Coolidge* v. *Gloucester Ins. Co.*, 15 Mass. 341; *Hubbell* v. *Great Western Ins. Co.*, 74 N. Y. 260, 261; 3 Kent's Com. 333).

If the owner had raised the vessel himself and brought her with her cargo of coal into New Haven, or if that service had been rendered by salvors, instead of a company, for a stipulated sum, then there would be no question, under the general rule, of the plaintiff's right to the freight, and of his lien upon the cargo for the payment of it (*Hubbell* v. *Great Western Ins. Co.*, 74 N. Y. 258, 262; *Allen* v. *Mercantile Mut. Ins. Co.*, 44 N. Y. 437); for the freight would then have been earned, notwithstanding the delay caused by the disaster. This being the rule, it appears to me that it can make no difference to the owners of the cargo whether this was done by the plaintiff himself or his indemnitors. The result in both cases would be the same; and, as was said in the above cited case of *Hubbell* v. *Great Western Ins. Co.* (p. 263), there is no equity in allowing insurers on cargo to take it free of freight. If the plaintiff had not been indemnified he would, to earn the freight, have had to do, and probably would have done, at the expense of the vessel and cargo, what his indemnitors did. As the vessel, however, was insured, he preferred, instead of doing this, to abandon her to the insurance company, if they would pay as for a total loss, which they would not. This does

not prove that there had been an abandonment by him of the cargo to the owner. It simply shows that he was willing to abandon her in a contingency that never happened— the agreement by his insurers to pay him for a total loss; and it is not by what he wished to, or was willing to do, but by what he did, or omitted to do, that the plaintiff's right to the freight can be affected, the cargo having been brought to the port of destination.

The insurers of the cargo, after they were subrogated to the rights of the owner, united with the insurers of the vessel, in accepting the proposals of the wreckers to raise her for $1,000, " to be apportioned between the boat and the cargo, according to the law and usage of general average in such cases." This would not affect the question of freight, for the cargo as well as the vessel had each to bear their due proportion of the expense of raising her, as by that both the vessel and the cargo were saved (*Birkley* v. *Presgrave*, 1 East 228).

Where, by the perils of the sea, the goods are in a situation of danger, expenses necessarily incurred for saving or taking care of them are not chargeable against the shipowner, or the freight, but against the cargo, which charge upon the goods in no way prevents the earning of freight if the goods are brought to the port of destination and can be delivered (*Hubbell* v. *Great Western Ins. Co., supra*, 260, 261; *Heyliger* v. *New York Firemen Ins. Co.*, 11 Johns. 85; *Bradhurst* v. *Columbian Ins. Co.*, 9 Johns. 14; *Briggs* v. *Merchant Traders &c. Assoc. Co.*, 13 Q. B. 167; *Job* v. *Langton*, 6 Ellis & B. 779).

The act of the defendants, therefore, as the subrogated owners of the cargo, in uniting with the insurers of the vessel in employing the wreckers to raise her, as it was not done at the plaintiff's request, or from any offer made by him to surrender the cargo to them, was their own voluntary act. They incurred no personal liability thereby. The agreement of the wreckers was that the $1,000, for which they agreed to raise her, was to be apportioned between the vessel and the cargo, according to the law and usage of

general average. If they did not succeed in raising her
they would not get anything; and if they did, the vessel
and cargo were proportionably chargeable with the payment
of their reward. If the defendants had not united at all,
and the Buffalo Insurance Company had alone employed
the wreckers that raised her, the cargo which had been
saved thereby would have had to bear its due proportion of
the expense incurred in preserving it, in whatever mode its
proportion was ascertained, either by a voluntary submis-
sion to an adjustment by general average, or through the
instrumentality of a court of admiralty. The defendants,
as subrogated owners of the cargo, were interested in the
amount of the expense, a proportionable part of which
would, under any circumstances, be chargeable upon the
cargo if rescued, and by uniting with the insurers of the
vessel they had the advantage of fixing beforehand what
the reward should be. This, as I have said, was their own
voluntary act, which they did in their own interest as owners
of the cargo. For doing it they had a motive entirely inde-
pendent of the question of freight; and this act can in no
way be construed as a surrender or abandonment of the
cargo to them by the plaintiff.

In addition to this, it appears that they, or rather their
president, Mr. Paulison, did not know that the plaintiff's
indemnitors—the Buffalo Insurance Company—in exercis-
ing the right it had reserved under its policy, had to raise
the vessel for the benefit of all concerned; for Mr. Paulison
testifies that he did not know that that company were act-
ing on the plaintiff's behalf in order to save a total loss,
but supposed they were raising the boat to protect them-
selves from the full insurance, and by raising it and taking it
to New Haven, to save that right. Being ignorant there-
fore of what was contained in the policy upon the vessel,
which Paulison testified he afterwards found out, the defend-
ant may have supposed that there had been an abandon-
ment of both the vessel and cargo, and that, by uniting
with the insurers of the vessel, after an abandonment, they
were engaging for the recovery of the cargo they had in-

sured, as property lost and abandoned to the owners and insurers. Their mistake, if they acted under this impression, could not affect the plaintiff's rights.

The wrecking company were in the actual possession of the vessel and her cargo when she was brought into New Haven, but both were deliverable up by them on the payment of the $1,000 which they were to receive. Subject to this payment, the vessel and cargo were constructively in the possession of the plaintiff, for whose benefit as owner, as well as that of others concerned, it was raised and carried into the port of destination. He had a vested interest in the vessel, as owner, and to the extent of his lien, a special property in the cargo; so that, under these circumstances, their possession was his possession (*Franklin* v. *Neate*, 13 Mees. & W. 481; *Richards* v. *Symons*, 8 Ad. & E. N. S. 90; *Reeves* v. *Capper*, 5 Bing. N. C. 136; 6 Scott 877; 1 Arn. 40; *Tuthill* v. *Wheeler*, 6 Barb. 364; *Hale* v. *Omaha Nat. Bank*, 49 N. Y. 631).

The vessel was loaded, when she sank, with a cargo of coal, and the result of the Buffalo Insurance Company's election to raise her, was, that she was raised with the coal in her and brought to New Haven, where the cargo was capable of delivery according to the contract for its carriage. When the vessel was brought into New Haven, the plaintiff was notified of the fact by Mr. Baxter, of the wrecking company, and by Mr. Carpenter, the managing agent of the Buffalo Insurance Company, and Carpenter told the plaintiff to take charge of the boat, to which he replied that he would; and he accordingly sent his brother to take charge of her, who came back and told him that the boat was yet under water, hanging in the chains or pontoons.

It appeared by the testimony that within a week after the accident, and before the vessel was raised, Mr. Paulison and the plaintiff had an interview at the defendants' office, in which Paulison told the plaintiff that he (the plaintiff) had no claim for freight, and that the plaintiff told Paulison not to take the coal from the boat. And it further

appeared that, after the plaintiff was notified that the vessel had been raised and brought to New Haven, he went to the defendants' office to see the president, Mr. Paulison, to notify him that the coal must not be taken from the boat until the freight was paid; that Paulison again reiterated that the plaintiff could not claim the freight; that he, Paulison, was not obliged to pay it; and that the plaintiff told him that he must not take the coal away, and that Paulison said he would take it in spite of him and give him all the law he wanted. The plaintiff further testifies that he told Paulison that his captain had put a buoy on the boat before she sank, and thus located her where she could easily be found; and adds that he did not then know what the Buffalo Insurance Company intended to do; that they told him they were going to raise the boat. All of which testimony shows that there was no intention on the part of the plaintiff to abandon the cargo to the owners and insurers, releasing it from the payment of freight, but, on the contrary, a clear indication and notice that they were not to take it without paying the freight.

There was some conflict between the plaintiff and Paulison as to what occurred between them. But it was for the jury to determine which of these two witnesses was to be relied upon. Whether Paulison's version was susceptible of the construction that the plaintiff surrendered up the cargo to him, intending to have nothing further to do with it, thereby abandoning any right to the freight, or whether it presented a state of facts upon which different minds might come to different conclusions, it was equally a question for the jury and not for the court.

As the case comes before us, the court, in my opinion, were not justified in assuming, as a matter of law, that the plaintiff had abandoned the cargo to the defendants and thereby relinquished the freight. On the contrary, as his own indemnitors would not accept an abandonment of the vessel, it is scarcely to be supposed that he would, knowing that they had elected, under the policy, to raise the vessel, have surrendered the cargo to the defendants and all right

to the freight; for even if there had been an abandonment of the vessel to the insurers of it, he would have been still entitled, upon the authorities already cited, to the freight *pro rata itineris*, the vessel and her cargo having been brought by the abandonees into the port of destination.

The general rule is that the master cannot voluntarily surrender or abandon the cargo, if the vessel can be repaired within a reasonable time, the obligation of the owner or master being to exercise every reasonable means to deliver the cargo (*Allen* v. *Mercantile Mutual Ins. Co.*, 44 N. Y. 441).

It is not essential to inquire whether this general rule would apply in a case like this of a vessel sunk with her cargo in forty feet of water, and where the expense of raising her with her cargo was so considerable (*Dickey* v. *American Ins. Co.*, 3 Wend. 658), as the plaintiff relied upon his indemnitors to raise the vessel, which is the full extent of his acts, so far as they are relied upon, to establish as a matter of law a surrender and abandonment of the cargo to the defendants.

In the case above cited (*Allen* v. *Mercantile Mutual Ins. Co.*), the vessel, after the injury she had sustained, was repaired and was ready to resume her voyage, but. could not do so until the following spring, as the canal through which she had to pass to Lake Ontario was closed by ice, involving a delay of four or five months. Under these circumstances the shipper demanded his wheat, which formed a part of the cargo, and the master, instead of insisting upon his right of retaining it and delivering it at the port of destination, or not to give it up unless full freight was paid to him, which it was held he might have done, voluntarily surrendered it, and thereby, it was held, lost his right to the freight, and could not recover an insurance upon it. This was a very different case from the present one, for here the owner, after the disaster and after his indemnitors had notified him of their intention to raise the boat, forbade the defendants from taking the coal without paying the freight, they claiming that they were released from the payment of

it, and according to the plaintiff's testimony the position he then assumed towards them he retained throughout.

Paulison testifies that "the plaintiff did not tell him in so many words that he had abandoned the boat and would have nothing to do with it, but gave him the impression that he was going to have nothing more to do with it," which could not have been the case, if the plaintiff's statement was true, that at this interview he told Paulison that he must not take the coal away, an interview which occurred, as I have said, four days after the disaster, and before the vessel was raised.

After Paulison had so testified, the plaintiff was recalled and denied that he, either in words or in substance, said to Paulison that he would have nothing to do with the boat or had abandoned her, but on the contrary that he told him, as before stated, that the master had located the spot where she had sunk by a buoy, by which she could easily be found.

The controlling fact in the case is, I think, upon the testimony even as it stands upon the conflict between Paulison and the plaintiff, that there never was an abandonment either of the vessel or cargo. When the vessel, therefore, was brought into New Haven, the plaintiff, under his policy with his indemnitors, was entitled, after the wreckers were paid, to take possession of her and her cargo. As the cargo was then capable of delivery, he had a lien upon it for his freight, and if he lost his lien through the wrongful act of the defendants, he can maintain an action against them of this nature, the injury being permanent, for it destroyed his lien, and can recover as his damages the amount of the lien and interest (*Mears* v. *London & Southwestern R. Co.*, 11 C. B. N. S. 850; *Tancred* v. *Allgood*, 4 Hurlst. & N. 438; 28 Law J. Exch. 362; *Reeves* v. *Capper*, 5 Bing. N. C. 136; *Mayhew* v. *Herrick*, 7 C. B. 229; Addison on Torts, 348, 349, 310, 311, 3d Lond. Edit.; Cross on Lien, 39).

The case is distinguishable from *Goulet* v. *Asseler*, (22 N. Y. 225), and the cases upon which it was founded, of *Hull* v. *Carnley* (11 N. Y. 502, and 17 N. Y. 202), *Van Antwerp* v. *Newman*, (2 Cowen 543), *Carpenter* v. *Town*

(Hill & D. Supp. 72), and *Gordon* v. *Harper* (7 Term 9) ; for, in all these cases, the owner had parted with the possession of the property for a definite period of time, and had neither actual possession nor the right of possession when the property was taken. But in the present case, the defendant was constructively in possession when the cargo was sold by the direction of the defendants, the possession of the wrecking company being his possession, as he had never, as in the former cases, voluntarily divested himself of the right to the possession of it; in addition to which it was conceded by SELDEN, J., in *Goulet* v. *Asseler* (*supra*), and in the subsequent case of *Manning* v. *Monaghan* (28 N. Y. 589), that although trespass or trover would not lie under the technical rule, as the plaintiffs in those cases had neither actual possession nor, at the time of the conversion, any right to the possession, an action would lie founded upon the special circumstances of the case, setting forth the injury to the contingent interest of the plaintiff in the property and claiming damages for such injury; and I think the complaint in the present case is of this character, as it alleges that the plaintiff was a common carrier and had in his possession on board the boat, Arizona, of which he was the owner, a large quantity of coal, which he had carried from New York to New Haven *on freight*, and that the defendants entered upon said boat, and with force and arms took therefrom the cargo aforesaid, which I think sufficiently disclosed the special circumstances that constituted his cause of action and what he specifically sought to recover (*Mears* v. *London and Southwestern R. Co.*, *supra; Tancred* v. *Allgood*, *supra; Franklin* v. *Neate*, *supra*).

In *Hale* v. *Omaha Nat. Bank* (49 N. Y. 631), it was expressly adjudged that, where the plaintiff had a valid lien upon a quantity of household furniture which was not in his actual possession, but in the possession of the lessees of a hotel, which lien was well known to the defendant, who, in violation of the plaintiff's rights and without his consent, sold and converted the property to his own use, by which means the plaintiff was deprived of his lien, the

plaintiff had a good cause of action against the defendant; that as the defendant, without color or claim of title, converted to his own use chattels in which the plaintiff had a special property, he was liable at the suit of the latter for the value of the special property and the damages actually sustained by him.

The evidence in the present case is that the defendants, through their president Paulison, assumed to exercise control and dominion over the cargo of coal, in defiance of the plaintiff's right to freight and his lien for it; that, though notified by the plaintiff not to take the coal away without the payment of the freight, Paulison, while the vessel was in the possession of the wreckers, directed them to sell the coal, which they did, out of the proceeds of which they deducted the proportion of the $1,000 that was chargeable upon the cargo, and paid over the residue to the defendants.

I think, therefore, that the complaint was erroneously dismissed, and that a new trial should be ordered, with costs to the appellant to abide the event.

Van Brunt, J.—I concur in the result.

J. F. Daly, J.—I concur.

Judgment reversed and new trial ordered, with costs to abide event.