## POST, GRINNEL AND MINTURN *against* THE PHŒNIX INSURANCE COMPANY OF NEW-YORK.

### THE SAME *against* THE SAME.

THESE were actions on two several policies of insurance, on the vessel called the *Radius,* and her cargo, " at and from *New-York* to *St. Sebastians* or *Pasage,* and if turned off, or the captain thinks it prudent not to enter, with liberty to proceed to *Ton-* were insured from *New-York* to *St. Sebastians;* the insured were not to abandon, if captured or detained, until six months after notice given of the capture, &c.

One quarter of the ship *Radius,* valued at the sum insured, 5,500 dollars, and her cargo, if captured or

Being off *St. Antona,* about 3 leagues distant, they took a pilot for *St. Sebastians,* but being informed that a vessel which had been and was then following them, was a *British cruiser,* which had taken several *American* vessels bound to *St Sebastians,* and the wind being light and unfavourable, the master, with the advice of the pilot, put into *St. Antona,* for fear of capture and detention, with intent to proceed, with the first fair wind, to *St. Sebastians.* On arriving at *St. Antona,* the *Radius* and her cargo were seized by the officers of the government there, acting under the orders of the *French* emperor; on the 12th *January,* 1810, the ship's register, roll of her crew, and other papers were taken from the master, and never returned; the cargo was taken out and sent to *Bayonne,* and the vessel detained until the 8th *July,* 1810, when *St. Antona* having been taken by the *English* and *Spaniards,* the *Radius* was taken by an *English* frigate, and carried to *Corunna,* and there detained by the *English* and *Spaniards* until 30th *October,* 1810, when she was given up, on payment of *salvage,* and permitted to return to *New-York* in ballast, but not to proceed to *St. Sebastians,* and the master, to pay the *salvage,* and necessary expenses, borrowed money on *bottomry,* and the ship arrived at *New-York,* the 9th *November,* 1810. On the 1st *May,* the insured gave notice of the capture to the insurers, and on the 1st *November,* 1810, gave notice of abandonment, and on the 7th *November* gave proofs of interest and loss, and demanded payment for a total loss. It was *held,* that the going into *St. Antona* was justifiable and not a *deviation;* and that the insured were entitled to recover for a *total loss* for the whole sum insured; the ship not having been so recovered, as to be in a legal capacity to prosecute her voyage, and the valuation being applicable to the interest insured, and not to the whole ship.

ning*en.*" The policy on the vessel was on *one fourth*, valued at the sum insured. (5,500 dollars.) The policy on the goods was on one fourth of 767 bales of *United States* cotton, "valued at the sum insured," which was 10,000 dollars. The policies contained the usual clause : " warranted *American* property ; proof to be required here only : also not to abandon, if detained or captured, until six months after notice given to the office, unless previously condemned ; nor if refused admittance or turned away, but may proceed to any other near open port."

The loss was averred to have happened by the property insured being attached, seized, captured and taken possession of by certain subjects of the Emperor of *France*. On the 1st *May*, 1810, the plaintiffs gave notice to the defendants that the *Radius* had been captured and carried into *St. Antona ;* on the 1st *November*, 1810, they made an abandonment for a total loss, and on the 7th of the same month they wrote to the defendants confirming their abandonment, and enclosing the protest and other proofs of loss and interest.

The *Radius* sailed from *New-York*, the 12th *December*, 1809, on the voyage to *St. Sebastians*, and on the 11th *January*, 1810, at 1 P. M. made *St. Antona's Head*, bearing south, distant 2 or 3 leagues, and saw a number of fishing boats bearing east, and at the same time a brig, bearing E. N. E., standing direct for the *Radius*, having tacked for the purpose, which brig they had discovered, at a great distance, 2 hours before. From an apprehension and belief that the brig was a *British cruiser*, the captain and chief mate thought it prudent, for fear of capture, to obtain a pilot from the fishing boats, and get into *St. Sebastians* as soon as possible ; and having procured a pilot, they stood on direct for *St. Sebastians*, then 20 or 30 leagues distant ; and the brig continued to stand on for the *Radius*. The pilot informed the master of the *Radius* that the brig was an *English* cruiser, and had been cruising off that port for some days, and had captured several *American* vessels. The wind being light, and finding that the brig gained on them, and that the *Radius* could not continue her course to *St. Sebastians*, without being overtaken, and a manifest risk of capture and detention by the brig, it was thought best, and by the advice of the pilot, to stop at *St. Antona*, as a place of safety, and from thence to proceed, with the first fair wind, to *St. Sebastians*, then about 20 leagues distant ; and the *Radius* accordingly stood in direct for *St. Antona*, but, on account of the

wind and tide, was obliged to anchor at 1-2 a league off; and was
watched by the brig all night; early the next morning the *Radius*
got under way, intending to get into *St. Antona*, the wind being
very light, when a pilot and 5 men came on board, who said they
were sent by the commandant to take charge of the ship and as-
sist in getting her in; and soon afterwards an officer and a party
of soldiers came on board, and ordered the captain and mate of
the *Radius* and six men to go on shore, with the ship's papers,
for the inspection of the commandant. The captain and men were
detained by the commandant, who said he had orders to send the
papers to *St. Andero*, and to seize and take possession of the ship
and cargo. The ship having been brought to anchor in the port,
the master and mate, in the afternoon of the 12th *January*, 1810,
were permitted to go on board, but the men and papers were de-
tained. The ship was found to be in possession of a guard of
soldiers, who refused to give her up. The ship's papers, among
which were the *American register*, a *Mediterranean* pass, list of
the crew, invoice and bill of lading of cargo, were never afterwards
returned. The cargo, against the remonstrances of the master,
was taken out of the *Radius*, in lighters, and sent to *Bayonne*, and
was never afterwards restored. The vessel remained in posses-
sion of the persons who had so seized or captured her, until the
5th *July*, 1810, when *St. Antona* was taken by the *English* and
*Spanish* forces, and the *Radius* was boarded by *Spanish* privateers
and row-boats, who kept possession until the 8th *July*, when an
*English* frigate arrived and took possession of her, at which time
the master of the *Radius* had gone to *St. Andero*. On the 9th
*July*, the *English* frigate took the *Radius*, as a prize, to *Corunna*,
where they arrived the 15th *July*. The *Radius* was detained in
possession of the *English* and *Spaniards*, at that place, until the
3d *October*, 1810, when the mate, in the absence of the master,
with advice of the *American* consul, for the interest of all con-
cerned, agreed to pay a salvage of 2,666 dollars and 66 cents,
but having no money, he borrowed that sum, and also a further
sum of 1,102 dollars and 84 cents, to defray the expenses of
equipping the *Radius* for *New-York;* for which sums and the in-
terest, he executed to the lender a *bottomry* bond, on the ship, for
4,617 dollars and 60 cents. The *Radius* left *Corunna*, under the
command of the mate, on the 9th *October*, and arrived at *New-
York* the 9th *November*, 1810, under the *bottomry*.

ALBANY,
Jan. 1813.

Post
v.
Phœnix Ins.
Company.

The mate testified that he could not have proceeded with the *Radius* from *Corunna* to *St. Sebastians,* without great danger of capture and loss during the voyage ; and if she had arrived there in safety, without certainty of seizure, capture and loss, under the decrees and orders of the *French* government ; as all *American* vessels arriving, at that time, at *St. Sebastians,* had been seized by that government, and that the want of the ship's papers was alone sufficient to prevent her from going to *St. Sebastians;* and besides, he was informed by the *American* consul, that the *Radius* would not be allowed to clear out for *St. Sebastians,* and the *British* commodore informed him, that he could not proceed to any other port but *New-York,* in ballast, under pain of capture. When the *Radius* left *Corunna* for *New-York,* he obtained a certificate from the *British* commodore, and another from the *American* consul, to protect the ship and her crew from *British* or *Spanish* cruisers, during her voyage to *New-York.*

It appeared that *American* vessels bound to *St. Sebastians,* frequently touched at *St. Antona,* when the winds were light and unfavourable, to take pilots there, or at any of the places along the coast.

The counsel for the defendants objected ; 1. That the plaintiffs were not entitled to recover at all, because there was a deviation in going to *St. Antona.*

2. That even if there was no deviation, that the plaintiffs were not entitled to recover for a total loss, as to the vessel, as she was liberated and restored before the first abandonment, and before the expiration of 6 months from the notice of the capture.

3. That if the plaintiffs were entitled to recover for a total or a partial loss, yet in the policy on the vessel, they were only to be considered as insured to the one fourth part of the sum of 5,500 dollars, which was the valuation of the vessel in the policy.

These objections were overruled by the judge, who declared his opinion that the plaintiffs were entitled to recover for a total loss, and that they must be considered as insured to the full amount of the sum expressed in the policy. And a verdict was taken for the plaintiffs, subject to the opinion of the court, on a case agreed on by the parties ; the amount to be adjusted afterwards by persons named.

*Hoffman* and *Colden,* for the plaintiffs.

*Wells, T. A. Emmet* and *S. Jones,* jun. for the defendants.

Kent, Ch. J. delivered the opinion of the court. The counsel for the defendants have moved to set aside the verdict on the three following points:

1. That the deviation in going into *St. Sebastians* was not justifiable, and discharged the insurer.

2. That the total loss, as to the ship, ceased, by her liberation before the abandonment was made.

3. That the sum recovered is much greater than the sum insured, as the ship and the cargo were insured to only one fourth of the valuation mentioned in the policy.

1. The taking of a pilot and going into *St. Antona* was a justifiable deviation under the circumstances of the case. The want of wind is mentioned, but the governing cause of the deviation was, undoubtedly, the fear of capture by the *British* brig which was pursuing the *Radius*, and which, according to the information given to the captain by the pilot, had recently captured several *American* vessels bound to *St. Sebastians*. It was decided, in the case of *Murray* v. *The United Insurance Company*, (2 *Johns. Cases*, 263.) that the capture of a neutral by a belligerant cruiser, was a loss within the policy and a justifiable cause of abandonment. Being a peril insured against, it follows, of course, that the assured is justifiable in a deviation to avoid it; and it is always a question of fact whether the peril be so present and palpable as to excuse the deviation. In the case of *Reade* v. *The Commercial Insurance Company*, (3 *Johns. Rep.* 352.) a deviation by an *American* vessel, to avoid capture by a *British* cruiser, was allowed to be justifiable, if the facts were such as to render the deviation necessary or prudent. There was no question raised on the general point, as to the lawfulness of deviation by a neutral, to avoid capture by a belligerant. In this case we think the jury were warranted from the facts in drawing the conclusion, that the deviation in going into *St. Antona* was founded in a justifiable necessity.

2. The vessel and cargo, as soon as they had arrived at *St. Antona*, were seized by the *French*. The cargo was carried to *Bayonne*, and never restored; and the ship, after being for six months in the possession of the *French* power at *St. Antona*, was recaptured by the *British* and *Spaniards*, and carried to *Corunna*; and in *October* following, she was given up to her owners on the payment of salvage, but was not permitted to clear out or sail for *St. Sebastians*. All the ship's papers, such as her register, *Mediterranean* pass, *role d'equipage*, and the invoice and bill of la-

ding, had been seized at *St. Antona,* and were never restored. The ship was, therefore, left naked, without any documentary title or voucher to give her protection on the high seas; and all she obtained at *Corunna* was the certificate of the *British* commodore and of the *American* consul, to protect her on her return to *New-York.* Under these circumstances, the capture continued its destructive effects down to the time of abandonment. The ship was not so recovered as to be in a legal capacity to perform the voyage; and what was said by Mr. Justice *Paterson,* (3 *Cranch,* 396.) as to the necessity of these papers, is entitled to great weight. They are the requisite *insignia* to distinguish a vessel navigating the ocean with permission of her sovereign, and under the sanction of treaties and the law of nations, from a piratical or lawless rover. A vessel without her papers is liable to capture in time of war; and the *French Ordinance* (art. 6. tit. 9. *Des Prises,*) declares every such ship good prize. We do not wish to press this principle to extreme lengths, and to say, that in every case the loss of the ship's papers, as by being dropped overboard, or by fire, &c. would justify the breaking up of a voyage. This will depend, in some degree, upon circumstances, such as the place where, the time when, the cause why, and the portion of the voyage that has been, or that remains to be performed. But we think that, under the circumstances in which this vessel was placed at *Corunna,* the voyage insured was necessarily broken up by means of the capture, and that to have pursued it without papers, and against the leave of the power surrendering the ship, would have been an act of indiscretion and folly. The jury were, therefore, warranted in finding a total loss by capture, for to *that* peril the breaking up of the voyage is justly to be charged. In *Goss* v. *Withers* (2 *Burr.* 683.) there was a capture, recapture, and bringing into *England,* but the salvage was so high that the court of K. B. held that the insured was justified in abandoning, and considering the loss as total, *by the capture.*

3. The third point is without any solidity. One fourth of the ship was insured, and the vessel " thereby insured" was valued at 5,500 dollars. This valuation applied to the interest insured, and not to the whole ship. The endorsement on the policy is conclusive evidence that this was so understood by the parties, for the premium was paid on the whole valuation. The payment of premium is often resorted to, as a guide to interpretation. (*Po-*

*thier, Traité du Prêt à la Grosse,* s. 32.)   The same observation applies to both policies.

The motion for a new trial ought, therefore, in each cause, to be denied.