## J. GRAHAM, AND OTHERS, *against* THE COMMERCIAL INSURANCE COMPANY.

*Insurance on cargo, "at and from Carlsham to St. Petersburgh." The vessel sailed from Carlsham the 9th of November, 1813, and meeting with adverse winds, &c. attempted to get into Revel, as a place of safety; but finding it impracticable, she put into Port Baltic, on the 22d November Being informed that it would be impossible to reach Cronstadt, on account of the ice, and the wind and weather becoming favourable, she sailed from Port Baltic on the 23d November, intending to go to Revel; but the wind soon after suddenly changed, and the weather became thick; and while endeavouring to get into the bay of Revel, the ship struck on a shoal, and was lost. It was held, that the captain, having acted bona fide, and according to his best judgment, his going into Port Baltic, and afterwards attempting to get into Revel, was justifiable, and not a deviation.*

THIS was an action on a policy of insurance on *cargo*, on board of the *American* brig *African*, " at and from *Carlsham* to *St. Petersburgh*." The plaintiff claimed a total loss, which was averred to have happened by the perils of the sea, while the vessel was in the due prosecution of her voyage to *St. Petersburgh*. The cause was tried at the *New-York* sittings, in *November*, 1813, before the Chief Justice.

The plaintiff's counsel having read the depositions of the master and supercargo, the defendants' counsel stated their defence to be, that the *African* ought to have wintered at *Port Baltic*; and that the voyage from thence to *Revel*, in which she was lost, was a *deviation*.

The master deposed, that he sailed from *Carlsham*, in *Sweden*, on the 9th *November*, 1810, in the *African*, bound to *St. Petersburgh*. When he sailed from *Carlsham* he took on board a pilot for *Petersburgh*. The ship encountered adverse winds, frequent falls of snow, and heavy squalls, until the 20th *November*; the next day he made the *Dangarot*, and afterwards the lights on *Odesholm*, and at midnight the light on *Surp*; but the weather becoming so cold, and the sails and rigging so much covered with ice, and the wind growing unfavourable, that it was thought prudent to make a port for shelter, and several tacks were accordingly made, to get into the bay of *Revel*; but finding it impossible to get in before night, it was thought most prudent to bear away for *Port Baltic*, distant about 10 miles,

off which they came to anchor on the 22d *November*. The supercargo went on shore, and learning, on inquiry, that it would be impossible to get to *Cronstadt*, on account of the obstruction of the ice, it was determined to proceed to *Revel*, which is about 25 miles from *Port Baltic*, and in the route to *Cronstadt*. On the 23d of *November*, there being a moderate breeze from the southwest, and fine weather, the ship got under weigh, and stood out to sea. In the afternoon of the next day, the wind began to blow fresh, so as to oblige them to close reef their top-sails, and increased till four the next morning, with hard squalls, attended with snow and sleet. The gale continued to increase, and about seven A. M., by the direction of the pilot, they wore the ship, and stood in for *Revel* bay. Being deceived, by the thickness of the weather, as to the distances, the ship got aground on a shoal running off *Surp* point. Exertions were made to get off the ship; but the gale increasing, with heavy seas, she filled with water, and the crew, with some difficulty, left her in the boat. The master deposed, that the sole reason for proceeding to *Revel*, was because the supercargo had ascertained that she could not get to *Cronstadt* that season, on account of the ice; and had not that been the case, it was the intention of the supercargo to proceed direct from *Port Baltic* to *Cronstadt*. That when the ship left *Port Baltic*, it was determined to go to *Revel*, and there deliver the cargo, that it might be transported from thence to *St. Petersburgh*; but if there had been no obstructions to the navigation by the ice, the vessel would not have landed the cargo at *Revel*, but have proceeded to *Cronstadt*. That there is no port or place of delivery for *Petersburgh*, nearer to *Cronstadt* than *Revel*; and that it is very common for vessels bound to *St. Petersburgh* to deliver their cargoes there, when the navigation of the *Gulf of Finland* is obstructed by ice. That at the time the *African* was there, six *American* vessels, bound to *St. Petersburgh*, put into *Revel*, and discharged their cargoes. That when the *African* arrived at *Revel*, the *Gulf of Finland* was closed by the ice, so as entirely to interrupt the navigation as far down as the eastern part of the island of *Narjou*, which forms the boundary of the bay of *Revel*. There is good anchorage at *Port Baltic*, which is used as a *king's port*, and vessels occasionally winter there, but never when they can get into *Revel*, which is a port of entry, and the usual place

ALBANY,
August, 1814.

GRAHAM
v.
COM. INS. CO.

ALBANY,   of landing cargoes.   The little settlement bearing the name of
August, 1814.  Port Baltic contains no more than ten or twelve small houses ;
GRAHAM   but no stores or warehouses ; nor is it a place of delivery.
v.
Com. Ins. Co.   The deposition of the supercargo was substantially the same
as that of the master.

The defendants' counsel read in evidence the depositions of·
two masters of vessels, who had been in the *Baltic* and *Gulf of*
*Finland,* who said, that at the time the *African* entered *Port Baltic,*
had they gone there on account of the ice, they should have win-
tered there.   One of them said, a vessel proceeding from *Port*
*Baltic* for *Cronstadt,* would not stand in for *Revel,* and that if
she did, she would be entirely out of the track for *Cronstadt,*
and that the place where the *African* went aground was out of
the usual track; that *Revel* is a dangerous port to enter, but
when entered, is the best port in the *Gulf of Finland.*

The chief justice charged the jury that if·they believed that
the captain acted in good faith, in leaving *Port Baltic* for *Re-*
*vel,* he was justifiable in doing so; and then the passage thither,
on which the vessel was lost, would not, under the circumstances
of the case, amount to a deviation ; and the jury, thereupon,
found a verdict for the plaintiffs for a total loss.

A motion was made to set aside the verdict, and for a new
trial.

*Wells,* for the defendants.   The only question is, whether
there was a *deviation.   Revel* was not a port mentioned in the
policy, nor a port of necessity.   In order to justify stopping at
an intermediate port, there must be either a necessity for doing
so, or a usage of trade.   When the vessel arrived at *Port*
*Baltic,* which we admit was a port of necessity, it was ascer-
tained that it was impracticable to reach *Cronstadt,* the port of
delivery, and the cargo might then have been landed at *Port*
*Baltic,* and sent on to *St. Petersburgh,* or the vessel, after win-
tering at *Port Baltic,* might have proceeded, in the spring, when
the navigation was safe, to *St. Petersburgh,* her port of destina-
tion.   The cause or necessity which forced the *African* to seek
safety in *Port Baltic,* continued, and she ought not to have left
it merely to seek another port of necessity.   If this should be
allowed, a vessel might, without any justifiable cause, encoun-
ter the same perils, a second or third time, and, under the pre-
text of a port of necessity, go in search of a market.   *Revel*

was not a port or place in the voyage insured, and there was no reason for going there, unless for the sake of disposing of the cargo.

ALBANY,
August, 1814.

GRAHAM
v.
COM INS. CO.
*11 East, 22.

In *Parkin* v. *Tunno*,* the vessel was insured at and from *Bristol* to *Montevideo*, and any other port or ports in the river *Plata*, in possession of the *English*. On arriving in the *Plata*, all the places there, except *Maldonado*, were in possession of the enemy, and the *English* commander, on account of the situation of the *English*, ordered the vessel immediately away, and being short of water, and wanting repairs, she bore away for *Rio Janeiro*, as the nearest friendly port of safety, and in going there was lost; the court of K. B. held that the policy could not be extended, by implication, to cover the ship in her voyage to *Rio Janeiro*, though it was necessary to go there.

So here, the specific voyage insured is from *Carlsham* to *St. Petersburgh*; and the ship cannot be allowed to coast along the *Gulf of Finland*, from port to port. If she is allowed to go to *Revel*, because it is near to *St. Petersburgh*, she might afterwards go, for the same reason, to *Narva*; and thus, instead of a direct voyage to *St. Petersburgh*, she might go, from port to port, along the coast of the *Gulf of Finland*, and thereby greatly enhance the risks of the voyage. This loss has arisen, not on the voyage insured, but on a voyage from *Port Baltic* to *Revel*.

Suppose a vessel insured from *Charleston* to *Philadelphia*, and, on arriving at the mouth of the *Delaware*, should find the river so stopped with ice, as to render it impracticable to reach her port of destination, and should put into *New-York*, would she be covered by the policy, in afterwards going from *New-York* to *New-London*, or *Baltimore* ?

*Colden*, contra. *Port Baltic* is a small place, and not a port of entry or delivery; there are no warehouses there to receive cargoes. *Revel* is the best port in the *Baltic*, though somewhat difficult to enter. It is the nearest port to *St. Petersburgh*; and in case a vessel cannot get to *St. Petersburgh*, she may deliver her cargo there. If driven by a storm into *Port Baltic*, and the winds and weather afterwards became favourable to proceed on her voyage to *St. Petersburgh*, she would be justified in leaving *Port Baltic*, for that purpose.

ALBANY,
August 1814.

GRAHAM
v
COM. INS. Co.

If the *African* had remained at *Port Baltic* until spring, and afterwards had been lost in going to *Petersburgh*, the defendants would then have objected that there was a *deviation*, by reason of the delay, and that she ought to have gone to *Revel*, and there delivered her cargo. She did, in fact, attempt to reach *Revel* first. but was compelled to go into *Port Baltic*. The captain acted with good faith ; and had he reached *Revel*, in the first instance, would it have been pretended that it was a deviation ?

Again, the situation of *Revel*, and the usage of the trade, in regard to that port, as well as *Port Baltic*, justifies the conduct of the master.*

> Oddy on Commerce. 102. 166.

The case of *Parkin* v. *Tunno* is very different from the present. The vessel, in that case, did arrive at *Maldonado*, a port in the *Plata*, and she afterwards attempted to prolong her voyage by going to a place entirely out of its route. But here *Revel* is in the usual route to *St. Petersburgh*.

Take the case put by the defendants' counsel, and suppose a vessel bound to *Philadelphia*, stopped by the ice, should go to *Wilmington*, as a place of necessity, and finding afterwards that she could go on to a place much nearer to *Philadelphia*, should leave *Wilmington* to go to *Newcastle*, and should be lost, would not the insured be entitled to recover ?

*Wells*, in reply, said that if a map or chart of the *Gulf of Finland* was examined, it would be found that a vessel going into *Revel* is as much out of the direct and proper route to *St. Petersburgh*, as a vessel bound from *Charleston* to *Boston* would be, if she put into *New-York* or *New-London*.

There is a difference between a port of entry and a port of delivery, and the insured might have entered the vessel at *Revel*, while at *Port Baltic*, and obtained a permit to land her cargo at the latter place. But the defendants did not insure the entry or delivery of the cargo.

THOMPSON, C. J. delivered the opinion of the court. The going to *Revel* was no deviation. It was a port of necessity ; and the course of conduct pursued by the master was justified by the state of the weather and the obstruction of the navigation in the *Gulf of Finland* by the ice. It is no deviation to go

out of the way to avoid danger, or when compelled by necessity. It is, therefore, laid down as a general principle, which runs through all the cases on this point, that if the captain, in departing from the usual course of the voyage, acts fairly and *bona fide*, and according to his best judgment, to avoid the threatened danger, and thereby promote the benefit of all parties concerned, and has no other view but to conduct the ship and cargo to the port of destination, the policy still continues. His having put into *Port Baltic* as a port of necessity did not oblige him to remain there during the winter. And although the supercargo received such information there as to induce him to believe that they should not be able to reach *Cronstadt* or *Petersburgh*, the port of destination, yet both he and the captain swear it was their intention to go on, if not prevented by the ice. And it was not until they arrived off the bay of *Revel* that they ascertained with certainty that they could not proceed to *Cronstadt* by reason of the ice. It was prudent and discreet in the captain to go on to *Revel*. It was only about twenty-five miles from *Port Baltic*. The weather was fine and the wind fair, and there was every reasonable prospect of a speedy and safe arrival; and if he found it impracticable to go on, *Revel* was a much more safe and secure place to winter in than *Port Baltic;* the latter having no storehouses for storing the cargo in case it should become necessary to unload the vessel, nor is it a port of entry or delivery.

The jury have found that the captain acted in good faith, and that the necessity and circumstances of the case justified his going to *Revel;* and this finding is fully warranted by the evidence. Although there is good anchorage in *Port Baltic,* and vessels occasionally winter there, yet, from the testimony, it appears that they do not, when they can get into *Revel*. Besides, the case furnishes very strong evidence of a usage or custom for vessels bound to *St. Petersburgh* to put into *Revel*, and deliver their cargoes there, when the navigation of the *Gulf of Finland* is interrupted by ice. A number of *American* vessels had, at that time, put in there for that purpose. From the lateness of the season when this voyage was undertaken, it was reasonable to presume the navigation would be obstructed by ice, and underwriters must have calculated that the usual course of the voyage would, in such case, be pursued. Under these circumstances, it

ALBANY,
August, 1814.

GRAHAM
v.
COM. INS. CO.

would be carrying the doctrine of deviation to an extravagant length to apply it to a case like the present.

The motion for a new trial must accordingly be denied.

VAN NESS, J.   If this case had been left to the jury, to say whether, by the usage of trade, the master had not a right to go to *Revel*, and they had found for the plaintiff, I should have been better satisfied.   It was not put to the jury on that ground; and I think it very doubtful, whether any such usage exists, notwithstanding the evidence stated in the case.   I do not, however, mean to be considered as dissenting from the opinion of my brethren; though, at the same time, I am not perfectly clear as to the right of the plaintiff to recover.

Judgment for the plaintiffs.