AKTIEBOLAGET MALAREPROVINSERNAS BANK, Respondent, *v.* THE HANOVER FIRE INSURANCE COMPANY and Eight Other Insurance Companies in Separate Actions, Appellants.

First Department, February 6, 1925.

Insurance — marine insurance — war risk insurance — steamship was destroyed near Scotland by torpedo in 1917 — insurance excepted claims arising from seizure by British government or allies — steamship was seized by British government on return trip from Sweden to United States and detained in English port — British government would not release steamship except on condition that she make return trip to Sweden with cargo — on return trip from Sweden ship was destroyed — no abandonment of voyage — enforced trip to Sweden from England not deviation from route — prior to trip from New York steamship was released from attachment on surety company bond — surety company and parties who indemnified it in part on payment of judgment against ship had insurable interest — collection, by owner, of insurance taken out by it on return trip between England and Sweden does not affect question — exception against capture by British government not defense — said detention by British government not proximate cause of loss — provision in policies limiting time to commence action was waived or extended by negotiations of parties for settlement.

In an action on marine insurance policies covering certain war risks on a trip from New York to Sweden and return, which policies excepted capture by the British government or its allies, the facts show that the voyage had not been abandoned at the time the steamship was torpedoed near Scotland in 1917, nor was there a deviation from the route relieving the insurers of liability, since it appears that on the return trip of the steamship from Sweden to New York, it was captured by the British government and detained in a British port for examination and was not allowed to return to the United States with its cargo except upon condition that it carry a British cargo to Sweden and return with a Swedish cargo to Great Britain, and that the steamship was destroyed on the return trip from Sweden to England. The voyage from England to Sweden and return was not voluntary on the part of the ship but was compelled by the action of the British government, and it was necessary in order that the steamship might subsequently return to the United States with its cargo.

The surety company which gave a bond for the purpose of releasing the ship from attachment prior to its original departure from New York, and the parties who agreed to indemnify the surety company against loss and did in part pay the surety company the amount paid after judgments had been secured against the steamship, had an insurable interest in the steamship at the time the insurance was taken out and are entitled to be reimbursed to the extent of all

payments made by them to the surety company.   While the parties who agreed to indemnify the insurance company may have been agents for the owner only, nevertheless they were personally liable and did pay to the surety company the amount which they agreed to pay and their security was in the steamship which either by transfer or a trust agreement was to be held to indemnify them.

The fact that the owners insured for the return trip between England and Sweden and collected insurance money from the government of Sweden does not affect the protection obtained by the surety company and those who agreed to indemnify it.

The exception in the policies against capture by the British government or its allies is not a defense to the action, since the detention by the British government of the steamship in the British port was not the proximate cause of the loss; the proximate cause was a torpedo fired by either a German or an Austrian submarine and not the detention of the steamship.

A clause in the policies limiting the right of the insured to bring an action to one year from the date of the loss was either waived or extended by the negotiations entered into between the parties with a view to an adjustment of the claim, which negotiations extended over the one-year period, virtually at the request of the insurer.

APPEAL by the defendant, Hanover Fire Insurance Company, and the defendants in eight other actions by the same plaintiff, from separate judgments of the Supreme Court in favor of the plaintiff in each action, entered in the office of the clerk of the county of New York on the 11th day of January, 1924, upon the decision of the court rendered after a trial at the New York Trial Term, a jury having been waived.

The record consists of written interrogatories and cross-interrogatories attached to commissions and stipulations as to facts.   No testimony was taken in open court.   All objections to the evidence were reserved by stipulation and passed upon by the justice at Trial Term.

*Prentice & Townsend* [*Robert Kelly Prentice* of counsel], for the appellants in the above-entitled case, and in four of the other cases.

*Bigham, Englar & Jones* [*D. Roger Englar* of counsel; *Henry B. Potter* with him on the brief], for the appellants in the remaining four cases.

*Engel Brothers* [*Jacob B. Engel* of counsel; *Joseph G. Engel* with him on the brief], for the respondent.

MARTIN, J.:

On the 9th day of June, 1917, the steamship *Ada* was destroyed by a torpedo near Aberdeen, Scotland.   She was insured against certain war risks.   These actions were instituted to recover on nine separate policies of insurance issued during the month of September, 1916, at the city of New York.   The issues in all

39

the actions are practically the same. The policy issued by the Ætna Insurance Company differs from the others in that it contains a provision requiring the prosecution of all claims within one year from the date of the happening of the loss; and the policy of the National Fire and Marine Insurance Company differs from the others in that it does not contain a free-of-British-capture warranty.

Throughout the period involved in this litigation the *Ada* was owned by Rederiaktiebolaget Amie, hereinafter called the Amie Company. She was a Swedish vessel hailing from the port of Stockholm, Sweden. In June, 1916, while lying in New York harbor, she was attached in various suits brought against the Amie Company in the United States District Court for the Southern District of New York. In order to procure her release it was necessary to give bonds to the extent of $366,200. They were furnished by the National Surety Company, against certain collateral and various indemnity agreements. Among the indemnitors were Henrik Ryberg and C. I. Morin, both of whom were representatives in the United States of the Amie Company. As further security to the National Surety Company, the Amie Company conveyed the *Ada* to Ryberg, who on the same day executed an instrument whereby he agreed to hold the vessel in trust for the National Surety Company as security for the performance of his indemnity agreement. A week later, however, Ryberg reconveyed her to the Amie Company, which, at the same time, executed an agreement to hold her in trust for the National Surety Company and subject to all the conveyances and agreements heretofore made by Ryberg to and with the National Surety Company. All of the papers and documents mentioned above bear date during the period from June 22 to June 29, 1916.

As further security to the National Surety Company, when the steamer was about to sail on a round trip voyage to Sweden, in September, 1916, Ryberg took out insurance in his name in the total sum of $175,000 covering her against certain war risks, with loss, if any, payable to him " and/or the National Surety Company as interest might appear."

The risks covered were described as follows: " This insurance covers only the risk of capture, seizure, or destruction or damage by men of war, by letters of marque, by takings at sea, arrests, restraints, detainments and acts of kings, princes and people, authorized by and in prosecution of hostilities between belligerent nations; but excluding claims for delay, deteriorations and/or loss of market and warranted not to abandon in case of capture, seizure or detention, until after condemnation of the property insured, nor

until sixty days after notice of said condemnation is given to these Assurers.   Also warranted not to abandon in case of blockade, and free from any claim for loss or expense in consequence of blockade, or of any attempt to evade blockade; but in event of blockade to be at liberty to proceed to an open port, and there end the voyage."

With the exception of the policy of the National Fire and Marine Insurance Company, the policies all contained the following warranty: " Warranted free from any claim arising from capture, seizure, arrests, restraints, pre-emption or detainments by the British Government or their allies."

At the time this insurance was written the vessel was lying in New York harbor and was about to proceed on a voyage to Gothenberg and return.   In the policies the vessel was valued at $175,000. The voyage was described therein as follows:  " *   *   *   At and from New York to Gothenberg, whilst there and return to United States, Atlantic Port or Ports, direct or otherwise   *   *   *.' "

The *Ada* sailed from New York on September 30, 1916, and arrived at Gothenberg without having called at any British port and without having been stopped or searched by a British man-of-war.

On November 25, 1916, she sailed from Gothenberg bound for New York with a general cargo.   On December 2, 1916, she was stopped by a British man-of-war, a prize crew was placed aboard and she was taken into Stornaway in the Hebrides.   As a complete search could not be made there, she was ordered to proceed to Bristol, Eng., where her cargo was discharged and the vessel and cargo thoroughly searched.   The master and owners endeavored to procure her release, but they were unsuccessful until some time in March, 1917.   The defendants assert that during the early part of this latter month the vessel was released and was free to go wherever her owners directed.

There is a disagreement between the insurance carriers and the plaintiffs as to (1) whether the vessel, when released, had on board a sufficient supply of coal to reach an American port; and (2) as to the extent to which the British government undertook to dictate her future movements as a condition of permitting her to obtain the additional coal required to complete her voyage.

When the *Ada* commenced her return voyage to the United States, which was intercepted by the British man-of-war, she had an ample supply of coal.   During her stay in British ports a large portion of the coal was consumed, making it necessary, to obtain an additional supply before resuming the voyage to an American port.   The British authorities refused to give her additional coal until it was agreed that her cargo remain in England while she took on and carried a cargo of coal to Sweden and returned

to England with a general cargo. The owners of the vessel, believing it prudent to do so and evidently having no alternative, chartered her to carry the cargo of coal from Swansea to Gothenberg. She sailed from Swansea on this voyage in April, 1917. The owners received $85,942.50 for carrying the freight to Gothenberg, where the vessel arrived safely and discharged her cargo. She then loaded a general cargo for Hull, Eng., arranged for by her owners, and sailed from Gothenberg on June 2, 1917. For this voyage, during which she was destroyed, her owners received a freight of $80,361.90.

The plaintiff contends that this voyage from England to Gothenberg was not only necessary in order to obtain coal to proceed to an American port, but that the English government would not permit the vessel to proceed on any other terms; and that the owners acquiesced in order to eventually carry to the United States the cargo which the ship had been compelled to unload in a British port.

The defendants assert that there was an unnecessary deviation and an abandonment or voluntary departure from the voyage insured against. To arrive at this conclusion their counsel indulged in numerous inferences which are wholly unwarranted by the evidence; and they say there was an unnecessary deviation, that the *Ada* was at liberty to go where her master chose after she was released preparatory to the voyage from England to Sweden.

It is unnecessary to devote much space to establish that at no time was she at liberty to proceed to New York or elsewhere, except as directed by the British government.

There is no force in the argument that there was a voluntary abandonment of the voyage. The captain did everything in his power to continue it. He says it was his intention to reload the cargo which the British authorities compelled him to unload and to then proceed to the United States; and that the voyage to Sweden was made in order to complete the original return voyage to the United States. (See *North British & Mercantile Ins. Co.* v. *Baars & Co.*, 255 Fed. 625.)

The argument that the trip to Sweden was a voluntary deviation is not very convincing in view of the fact that the owners were compelled to file a bond in the sum of 100,000 kronen to insure the return of the ship to an English port. It would seem that the deviation was not only necessary but prudent. It was made as a condition of obtaining coal to continue the voyage to America.

Chief Justice KENT has defined deviation from necessity and stated the effect thereof in *Post* v. *Phœnix Ins. Co.* (10 Johns. 79), where he said: " * * * a deviation by an American vessel, to

avoid capture by a British cruiser, was allowed to be justifiable, if the facts were such as to render the deviation necessary or prudent. There was no question raised on the general point, as to the lawfulness of deviation by a neutral, to avoid capture by a belligerent. In this case we think the jury were warranted·from the facts in drawing the conclusion, that the deviation in going into St. Antona was founded in a justifiable necessity."

As to what will excuse a deviation the appellants say that " The necessity or danger which will justify a deviation must be obvious, immediate, directly applied to the interruption of the voyage, and imminent; not distant, contingent or indefinite." They then cite *Graham* v. *Commercial Ins. Co.* (11 Johns. 352, 356). The latter case supports the view we take. It is there said: " It is no deviation to go out of the way to avoid danger, or when compelled by necessity. It is, therefore, laid down as a general principle, which runs through all the cases on this point, that if the captain, in departing from the usual course of the voyage,· acts fairly and *bona fide*, and according to his best judgment, to avoid the threatened danger, and thereby promote the benefit of all parties concerned, and has no other view but to conduct the ship and cargo to the port of destination, the policy still continues."

In Parsons on Marine Insurance (Vol. 2, p. 28) it is said: " The change of risk, to operate as a ' deviation,' must be not only voluntary but unnecessary; or rather, if it be necessary, it must be considered as compelled, rather than as voluntary."

On the question of insurable interest the argument of the appellants seems equally fallacious. Much of it is predicated on alleged inferences which it is asserted may be drawn from the facts. The following has been stipulated: " 4. That on and prior to June 22nd, 1916, the SS. *Ada* was owned by Rederiaktiebolaget Amie, a Swedish corporation, against which there were pending in the United States District Court for the Southern District of New York, various suits, in which suits writs of attachment had been issued out of the said Court and thereunder the SS. *Ada* had been seized and taken into custody by the United States Marshal for the Southern District of New York; orders had been issued in said suits authorizing the release of the vessel on the giving undertakings or bonds in the aggregate sum of $366,200; on June 22nd, 1916, one Henrik Ryberg, Managing Agent for Interchange, Limited, Shipping Agent at New York for the SS. *Ada*, and C. I. Morin, Director and Agent of Rederiaktiebolaget Amie, applied to the National Surety Company for bonds in the sum of $366,200; a photostatic copy of the said application is hereto annexed marked Exhibit ' A.' The said National Surety Company issued said bonds

in the sum of $366,200, copies of said four bonds being attached hereto and marked Exhibits ' A-1,' 'A-2,' 'A-3 ' and 'A-4,' against an indemnity agreement in its favor by Sven Largerberg, Henrik Ryberg, Interchange, Ltd., and Rederiaktiebolaget Amie, a photostatic copy of which is hereto attached, marked Exhibit ' B,' by which agreement said indemnitors jointly and sever'ally bound themselves to National Surety Company in accordance with the terms thereof in the sum of $366,200.

" At said time, Rederiaktiebolaget Amie, through C. I. Morin, one of its directors and agent empowered for that purpose, executed a document, copy of which is hereto attached, marked Exhibit ' C ' and Henrik Ryberg on the same day executed and delivered to National Surety Company a document, of which a copy is hereto attached, marked Exhibit ' D.' Said last mentioned instrument was never registered. In addition to Exhibits ' B ' and ' D ' delivered to National Surety Company as above, the National Surety Company also received from Henrik Ryberg and Interchange, Limited, as collateral on June 22nd, 1916, the sum of $140,000, and from June 27th to July 15th, 1916, a further sum of $56,000. It also received in September ten war risk policies aggregating $175,000, nine of which said policies being the subject of the present litigation and referred to in a succeeding paragraph hereof. Said war risk policies were so delivered to National Surety Company, following the letters hereto attached, marked Exhibits ' E ' and ' F ' respectively.

" That on June 22nd, 1916, the National Surety Company did execute the aforesaid undertakings and /or stipulations for value in the sum of $366,200 dated that day, whereby .it obligated itself to pay any judgments which might be recovered in the suits aforementioned in a sum not exceeding $366,200. The undertakings and /or stipulations for value aforesaid were duly approved by a Judge of the District Court of the United States for the Southern District of New York, whereupon and in the month of June, 1916, and after the filing of said undertakings and /or stipulations for value in the office of the Clerk of the United States District Court for the Southern District of New York, an order was made by the United States District Court for the Southern District of New York directing the United States Marshal to release and discharge the SS. *Ada* from his custody, wherein in the meantime, she had been under the attachment aforerelated; the *Ada* was accordingly so released and discharged.

" 5. That thereafter Henrik Ryberg and Rederiaktiebolaget Amie executed simultaneously two instruments each dated June 29th, 1916, which are hereto attached, marked Exhibits ' G ' and ' H '

respectively. The National Surety Company was not advised of these documents. This, however, is not to be regarded as an admission by plaintiff that the National Surety Company was entitled to any such notice and is also subject to the objection of competency and relevancy."

In view of the stipulated facts, with no evidence to the contrary, it is difficult to understand how it may be seriously contended that there was no insurable interest in Ryberg or the National Surety Company.

The litigation in which the National Surety Company had given security was finally disposed of adversely to the Amie Company in the latter part of June, 1918. The surety company then paid the judgments which had been rendered against the Amie Company and made up its accounts showing total disbursements of $355,923.73. Its receipts totalled $355,037.54, indicating a deficiency of $886.19, which was subsequently paid by the Amie Company to the National Surety Company on September 17, 1918. As part of the total so received by the surety company $60,000 was received by it on May 10, 1918, from Malareprovinsernas Bank, the plaintiff herein. The surety company was reimbursed as follows:

" Funds paid on June 23, 1916:

| | |
|---|---:|
| Henrik Ryberg. | $140,000.00 |
| Interest from N. Y. City Bond Coupons in which the aforesaid money and money of Interchange, Limited, were invested to date of sale thereof. | 11,055.25 |
| Interchange, Ltd.: | |
| June 27 to July 15, 1916 — checks aggregating. | 56,000.00 |
| American Union Line a/c Interchange, Ltd.: | |
| Oct. to Dec. 1917 — checks aggregating. | 63,968.61 |
| Interest from Liberty Loan Coupon Bonds in which aforesaid moneys were invested. | 1,020.92 |
| War Risk Insurance British-American Ins. Co.: | |
| April 3, 1918 — check received from Johnson & Higgins for. | 19,796.00 |
| Bank interest on moneys, deposited between June 22, 1916, and June 27, 1918, constituting collateral funds. | 3,196.76 |
| Malareprovinsernas Bank, Stockholm, Sweden: | |
| May 10, 1918,— check from Irving National Bank for account of Malareprovinsernas Bank. | 60,000.00 " |

According to this record, therefore, Ryberg has paid $140,000; the Interchange, Limited, has paid $56,000; the plaintiff bank has paid $60,000. The steamship company asserts no interest in the

action and the bank has an assignment from the parties who paid the money to release the ship when it was attached. It may be true that the steamship company has repaid all of these parties, but we must decide this case upon the record before us, and there is no evidence to show any such repayment. On the record, Ryberg, the bank and the Interchange, Limited, are entitled to be reimbursed to the extent of all payments made by them to the surety company.

They may have been agents only, but nevertheless they were personally liable on the bond and did together pay the amount which they agreed to pay. Their security was in the *Ada* and they had either a transfer of the vessel or a trust agreement that the Amie Company would hold her to indemnify them.

The vessel having been destroyed they can look to the insurance obtained as a protection in the very transactions wherein they were called upon to reimburse the surety company. The owners insured for the return trip between England and Sweden; and the owners collected $450,000 insurance money from the government of Sweden. But that does not affect the protection obtained for the surety company and those who indemnified it.

An insurable interest is defined to be a right in the property or a right derivable out of some contract about the property, which in either case may be lost upon some contingency affecting the possession or enjoyment of the property. (*Sturm* v. *Atlantic Mut. Ins. Co.,* 63 N. Y. 77, 80.)

Arnould in his work on Marine Insurance (10th ed. § 258) says: " Formerly the rule was laid down to be that the assured, besides being interested at the time of the loss, must also be interested at the time of effecting the policy * * * but it is now established that an insurable interest subsisting at the time of loss is sufficient."

Joyce in his work on Insurance (Vol. 2, § 901) says: " There is no doubt but that if the assured has an insurable interest at the time the policy is obtained, and also at the time of loss, it entitles him to a recovery."

He cites as authority in New York, *Howard* v. *Albany Ins. Co.* (3 Den. 301); *Tallman* v. *Atlantic Ins. Co.* (3 Keyes, 87). (See, also, *Ætna Fire Ins. Co.* v. *Tyler,* 16 Wend. 385; *Clinton* v. *Hope Ins. Co.,* 45 N. Y. 454.)

The insurable interest need not be stated in the policy. (*Springfield F. & M. Ins. Co.* v. *Allen,* 43 N. Y. 389; *Ætna Fire Ins. Co.* v. *Tyler, supra.*)

Defendants say that it is clear on the record that Ryberg, if he had any insurable interest in the *Ada,* was interested in her

only as security for the owners' obligation to indemnify him against loss which he might incur by reason of having signed the agreement to indemnify the National Surety Company. He was not the owner of the vessel and his only interest in her lay in the fact that the real owner, to whom he had reconveyed her immediately after the formal transfer to him, had agreed to hold her in trust for the National Surety Company and subject to the covenants and agreements which Ryberg had made with that company. They say there is not the slightest suggestion in the record that the owner failed to carry out this agreement or that Ryberg ever lost a dollar by reason of the loss of the vessel. Defendants also assert that as to the National Surety Company it affirmatively appears it was fully reimbursed and indemnified in respect of the liability which it has assumed. They argue that any recovery from the defendants herein will necessarily be the property of Ryberg's principal, Rederiaktiobolaget Amie, which has already collected from another set of underwriters the sum of $450,000 for a vessel which was valued in the policies issued by these defendants at the sum of $175,000. When this result is considered in connection with the circumstances that these defendants, who insured the *Ada* in September, 1916, for a voyage from the United States to Sweden, and return, have been held liable for the loss of the vessel in June of the following year while she was on the voyage from the United Kingdom to Sweden and return, defendants contend that the mere statement of the case is sufficient to show the decision of the trial court to be erroneous.

The plaintiff denies that the Amie Company will receive any part of the judgments. Plaintiff contends that there not only was an insurable interest in Ryberg, the National Surety Company and the owners of the vessel, but it is admitted that the National Surety Company paid out $355,000. In addition the owners lost their vessel, for which they received the $450,000. The plaintiff points out that, in order to release the vessel from the libel filed in New York, the owners went security and Ryberg also went security as an individual, and that finally the plaintiff bank, Ryberg and the owners were compelled to pay $355,000, the loss which the surety company suffered.

The surety company did not lose anything, but the question arises: "Who did lose the $355,000 that was paid by the surety company?" The plaintiffs say it was paid in part by the owners of the vessel and in part by several other people, including Ryberg, who personally paid $140,000, and that they are entitled to reimbursement.

On the question of insurable interest at the time the insurance

was taken out there cannot be any question whatever. All of the parties who made themselves liable on the surety company bond as well as the owners of the vessel had an insurable interest to the extent of their liability. At the time this vessel was sunk they had become liable for the sum of $355,000. There is, therefore, no basis for saying that they had no insurable interest either at the time of the issuance of the policy or at the time of the loss.

Another point urged by all of the defendants except the National Fire and Marine Insurance Company is that the ship was lost by a peril against which she was not insured. They contend that if the intermediate voyage to Sweden be regarded as compulsory, the warranty against British capture affords a complete defense under all the policies excepting that of the National Fire and Marine Insurance Company. The latter policy contained no such clause. They assert that by reason of this warranty there can be no recovery from the underwriters if the loss of the *Ada* was due in any way to the restraint or capture by the British government. They cite as an authority for that proposition *Roget* v. *Thurston* (2 Johns. Cas. 248). The plaintiff asserts that this case was afterwards, in effect at least, overruled by a higher court of this State.

For the defendants it is said these clauses were written in the policy in the light of conditions known at the time, and that every ship that sailed these seas was compelled by the British to go to a British port and there submit its cargo and personnel for examination; and that the length of the detention for such examination depended upon the good will or the ill will of the British officer making the examination or of his superiors. The *Ada* on a previous voyage was ordered in and detained at a British port for two weeks.

In order to determine whether the effect of this clause is to defeat recovery, it is necessary to ascertain what was the proximate cause of the loss. We are aided in a solution of this question by *Bradhurst* v. *Columbian Ins. Co.* (9 Johns. 9; Id. 17) and *Schieffelin* v. *New York Ins. Co.* (Id. 21).

Chief Justice Kent said in *Bradhurst* v. *Columbian Ins. Co.* (*supra*): " The loss of the ship is to be attributed to the perils of the sea. She was forced into the Texel, by distress and danger, arising from tempestuous weather; and when she was ready to depart, she was stranded and lost in consequence of a storm."

In the case of *Schieffelin* v. *New York Ins. Co.* (*supra*) Chief Justice Kent said: " In cases of partial loss, followed by a subsequent total loss, the former may properly be considered as merged in the latter, and the authorities which were cited to this point of *Green* v. *Elmslie* (Peake's Cases, 212) and *Livie* v. *Janson* (12 East, 648) were

cases of that description. But these cases do not apply when the first loss is, in judgment of law, total. If a succession of perils ensue, and the first, in the order of time, produces only a partial injury, everyone must concur in the good sense of the observation of Lord ELLENBOROUGH, that ' we are not to be seeking about for odds and ends of previous partial losses, when, at last, there was an overwhelming cause of loss which swallowed up the whole subject matter.' But suppose the policy was against capture only, and the vessel was captured and then shipwrecked, while in the hands of the captor, I should think the assured would have a right to abandon, and to maintain that his right to recover, as for a total loss, ·attached upon the capture, and that the subsequent casualty was one with which he had no concern. When the first loss is distinct, and so far total as to justify an abandonment, which is accordingly made, and there is no after recovery to defeat it, the rights of the parties are fixed, and we are not to be casting our eyes forward to see what further⊃ perils awaited the property. Those inquiries belong to ˙the insurer, in whom the residuary interest has vested."

In *Patrick* v. *Commercial Insurance Co.* (11 Johns. 9) Chief Justice KENT said: " The only important and serious question in the case is, whether the loss was, or was not, by sea risk. The case turns wholly upon this fact. The ship was stranded by the storm, and the place where she was stranded was, at the time it happened, though not at the time when the contract was made, out of the actual jurisdiction of the port and government of Cadiz, and under the actual· jurisdiction of a foreign and hostile force. The vessel and cargo were destroyed by this force within 48 hours after the ship was stranded, and before any experiment was made to relieve her."

In *Gates* v. *Madison County Mutual Ins. Co.* (5 N. Y. 469) JEWETT, J., said: " The rule is well established, not only in the English, but in the general⊃American insurance law; that in the absence of all fraud, the proximate cause of loss, only, is to be looked to; and the same rule now prevails in marine insurance. (*Waters* v. *Merchants' Louisville Ins. Co.,* 11 Peters, 213; *Columbia Ins. Co. of Alexandria* v. *Lawrence,* 10 id. 507; *Delano* v. *Bedford Ins. Co.,* 10 Mass. 355; *Patapsco Ins. Co.* v. *Coulter,* 3 Peters, 222; *Copeland* v. *N. E. Marine Ins. Co.,* 2 Metc. 432; *Williams* v. *Suffolk Ins. Co.,* 3 Sumn. 276; *Shore* v. *Bentall,* 7 B. & C. 798, note b; *Busk* v. *Royal Exchange Assurance Co.,* 2 B. & Ald. 73; *Shaw* v. *Robberds,* 6 Ad.· & E. 75; 3 Kent's Com., 5th ed. p. 300, note c; p. 307, note e; p. 374, note b.) "

The question is whether the proximate cause of the loss of the

vessel was the detention by the British government. No amount of detention by the British government would have caused the loss of the vessel. It was caused by the shell or torpedo fired by either a German or Austrian submarine, and not by detention imposed by the British.

In *Brown* v. *St. Nicholas Ins. Co.* (61 N. Y. 332) Commissioner Dwight said: " A well known writer on the law of marine insurance has laid down two rules applicable to this subject, which appear to be sound, and which were approved by the Supreme Court of the United States in *Insurance Co.* v. *Transportation Co.* (12 Wallace [U. S.], 196.) These rules are as follows: ' 1. In case of the concurrence of two causes of loss, one at the risk of the insured, and the other insured against, or one insured against by A and the other by B, if the damage by the perils, respectively, can be discriminated, each party must bear his proportion. 2. Where different parties whether the insured and the underwriters, or different underwriters, are responsible for different causes of loss, and the damage by each cannot be distinguished, the party responsible for the predominating efficient cause, or that by which the operation of the other is directly occasioned, as being merely incidental to it, is liable to bear the loss.' (1 Phil. on Ins. §§ 1136, 1137.) The present case falls under the second of these rules. The predominating efficient cause is the storm. It is well settled that an insurer is liable for all the consequences directly resulting from a peril insured against, as where a boat is lost after a storm has ceased, in consequence of damage done during a storm. (2 Pars. on Mar. Law, 261.) "

A very good illustration of proximate cause will be found in *McCahill* v. *N. Y. Trans. Co.* (201 N. Y. 221).

The Ætna Insurance Company also argues that there was a failure to comply with the provisions of the policy requiring the prosecution of all claims within one year from the date of the happening of the loss.

It was stipulated by the parties that the plaintiff was at liberty to introduce testimony of facts and circumstances to prove that after the loss of the *Ada* the defendant waived that provision of the policy, the same as if such waiver had been pleaded.

The parties also stipulated that all letters bearing on this issue might be filed and that they would be received in evidence without objection. Numerous letters passing between the parties in connection with these claims were filed and received in evidence. These show that defendants and plaintiff were corresponding with reference to the payment of this loss shortly after the vessel had been torpedoed; that ample notice of the loss was given to the company; and that the parties were dealing with each other with

a view to an adjustment. It seems to us that there was a waiver of this provision of the policy in view of the fact that correspondence was carried on over this period, virtually at the request of the company which desired to ascertain the facts before deciding to finally reject the claim. In any event the time was thus extended; and the action commenced within the period of one year thereafter. (*Mayor* v. *Hamilton Fire Ins. Co.*, 39 N. Y. 45; *Hay* v. *Star Fire Ins. Co.*, 77 id. 235; *Steen* v. *Niagara Fire Ins. Co.*, 89 id. 316; *Barnum* v. *Merchants' Fire Ins. Co.*, 97 id. 188.) The requirement may be waived. (*Bowen* v. *Preferred Accident Ins. Co.*, 82 App. Div. 458, 462.)

We have reached the conclusion, therefore, that the plaintiffs were entitled to recover and that the judgments were correct.

The judgments should be affirmed, with costs.

· CLARKE, P. J., MERRELL, FINCH and McAVOY, JJ., concur.

Judgments affirmed, with costs.